OPINION
{¶ 1} Candace Davis appeals from her conviction of two counts of murder and tampering with evidence after a jury trial. Ms. Davis' conviction resulted from her stabbing her boyfriend, Brent Ingram, in the leg, which resulted in his death.
 {¶ 2} At 4:26 p.m. on October 28, 2003, Moraine, Ohio police received a 911 call from Ms. Davis asking that someone be removed by the police from her apartment. Six minutes later Moraine police received another 911 call from Ms. Davis stating that her boyfriend had cut his leg on a bed. Officer John Howard was dispatched to Ms. Davis' apartment. After knocking several times, Ms. Davis came to the door and Howard noticed that the defendant had "a lot of blood on her clothing and she had a towel in her hands that had blood on it." Ms. Davis did not appear to be injured. She exhibited no bruises, no scratches, no lacerations, no swelling and no redness according to Howard. Howard asked her "what was going on." Ms. Davis motioned down the hallway to the master bedroom and said, "his leg's hurt — he's back there." Howard discovered Brent Ingram lying on the bedroom floor with a leg injury. Howard observed that the injury was severe because there was a tremendous amount of blood pooled underneath his leg where Ingram was lying. Ingram was still breathing, but he was unresponsive.
 {¶ 3} Within minutes, Ben Nartker and Michael Thomas Hall, a paramedic and an EMT with the Moraine Fire Department, arrived at the apartment in response to defendant's second 911 call. They found Mr. Ingram lying on the floor of the bedroom with his left leg extended. Once Nartker cut Mr. Ingram's pants away to see the injury, he and Hall observed a two-inch gaping hole running from the knee to the hip. The wound was deep enough to see bone, and it was no longer bleeding.
 {¶ 4} Officer Steve Norris asked Ms. Davis about the details of Ingram's injury and she replied that she had struck him with a hammer. Norris saw a hammer in the kitchen lying on a counter top next to a bloody rag. Norris said he took Davis to his cruiser where she said Ingram and she had been arguing and she asked if she could tell Ingram not to return to her apartment once he got out of the hospital. Norris said Davis became hysterical when she heard the medics say Ingram was not breathing. Davis told Officer Jennifer Smithhart that she did not mean to hurt Ingram and that she was sorry for what happened.
 {¶ 5} Ms. Davis was interviewed by Sergeant Craig Richardson later and she told Richardson she was pregnant with Ingram's child and was upset he did not attend her doctor's appointment with her. Ms. Davis said that during the argument at the apartment she got up in Ingram's face and he pushed her away and she fell backwards on the floor. Ms. Davis said she thought Ingram was going to kick her and so she grabbed the hammer and swung it at Ingram's left knee to force him to back up. After she realized she had struck him and that he was bleeding, she said she called the police for assistance.
 {¶ 6} The next morning Richardson attended Ingram's autopsy. Dr. Brian Casto, who performed the autopsy, noted a stab wound to Mr. Ingram's left leg. The weapon used to inflict the wound had gone clear through the leg and had completely severed a very large artery and vein behind the knee. The clean, linear appearance of the wound was inconsistent with having been caused by a hammer or anything associated with the bed in defendant's master bedroom, as defendant had claimed. Dr. Casto opined that a single-edged knife had been used to stab Mr. Ingram. Mr. Ingram ultimately died from exsanguination, resulting from the stab wound to his leg.
 {¶ 7} Following the autopsy, Sgt. Richardson went to the county jail to confront Davis with the information he had obtained from Dr. Casto. Richardson told Davis that he knew she was not telling the truth about the weapon she used to assault Mr. Ingram. Davis began to cry profusely and she apologized for lying about the hammer and said that she was scared. She admitted using a knife to stab Mr. Ingram. She stated that, when Mr. Ingram began to yell back at her, she went to the kitchen, got a knife out of the dishwasher, and carried the knife with her as she followed Mr. Ingram around the apartment, arguing with him. Ms. Davis told Sgt. Richardson that she had both the knife and the hammer in her hand when Ingram pushed her and she stabbed him in the leg with the knife.
 {¶ 8} At trial, Davis claimed that she had talked to Ingram over the telephone while waiting for the doctor to see her. She testified Ingram got mad when she was unable to tell him the sex of the baby, and she hung up on him. After her appointment, she said she picked Ingram up from a friend's house and he became angry with her when she refused to talk to him about the appointment and punched her. Davis said she called Mr. Ingram's grandmother and asked her to "tell [her] grandson to stop hitting on [her]." Davis testified that Ingram knocked the cell phone out of her hands and hit her in the back of the head when she bent down to retrieve it. Upon arriving at the apartment, Davis said Ingram put the car in park and snatched defendant's keys from her. Defendant reluctantly exited the car and made the first call to 911. She continued inside the apartment although she was scared of Mr. Ingram and knew the police were on their way. Once inside the apartment, defendant grabbed a knife from the pantry and threw it into the master bedroom. She said she planned to barricade herself in that room. According to Davis, Ingram confronted her in the baby's room. She claimed that Ingram was in her face, and she tripped over a plastic tub, after which Ingram was on top of her. Davis said she managed to get away and ran into the master bedroom. She said defendant continued to fight with her in that room until Mr. Ingram pushed her forcefully, causing her to fall to the ground. Davis testified that she was scared that Mr. Ingram was about to kick her, and she grabbed the knife and a hammer and hit him in the leg. She stated that she was not aware that the knife had gone into Mr. Ingram's leg until she saw the blood. She also maintained that she never intended to hurt Mr. Ingram. She said that she lied to the police because she did not want Ingram to get in trouble.
 {¶ 9} At the conclusion of the trial, Ms. Davis requested that the judge instruct the jury on the lesser included offense of involuntary manslaughter as the proximate result of the misdemeanor of aggravated menacing. The trial court refused stating that the evidence clearly indicated the defendant's conduct went "well beyond aggravated menacing" in proximately causing Ingram's death. The jury found Davis guilty of two counts of murder in violation of R.C. 2903.02(B) in that she was found to have caused Ingram's death as the proximate cause of committing felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2).
 {¶ 10} In her first assignment of error, Davis contends the trial court erred in not giving an instruction on involuntary manslaughter as contemplated by R.C. 2903.04(B). She contends a reasonable juror could have found that the underlying offense to the homicide was not felonious assault but simple assault in violation of R.C. 2903.13(B), to wit, that she recklessly caused serious physical harm to Ingram causing his death as opposed to knowingly causing serious physical harm to Ingram or knowingly causing harm to him by use of a deadly weapon.
 {¶ 11} The State argues that appellant's first assignment should be overruled because the defendant did not ask for a jury instruction on involuntary manslaughter as a proximate result of misdemeanor assault. Consequently, the State argues she has waived all but plain error with regard to the court's failure to give it. The State argues that there is no reasonable view of the evidence presented at trial which would support a jury finding that Ms. Davis acted recklessly rather than knowingly in causing serious physical harm to Ingram.
 {¶ 12} Crim. R. 30 provides in part that no party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict. A criminal defendant whose request for jury instructions fails to embody the correct law governing the matter involved, and who otherwise fails to comply with Crim.R. 30 by not formally objecting, waives his right to question the trial court's charge upon appeal. State v. Slone (1976), 45 Ohio App.2d 24.
 {¶ 13} Here the defendant through her counsel requested an instruction on involuntary manslaughter with the underlying misdemeanor being aggravated menacing. The trial court correctly refused to give that requested instruction. Appellant argues that while she did not request an instruction on simple assault, such an instruction was implicit in her request for an instruction on involuntary manslaughter. We disagree. Defendant was duty bound to identify the proper underlying misdemeanor which would support an instruction on involuntary manslaughter. She now contends that underlying misdemeanor was simple assault, i.e. recklessly causing serious harm to Ingram. She has however waived any error in the trial court's instructions. The failure to object to a jury instruction constitutes waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise. State v. Underwood
(1983), 3 Ohio St. 3d 12. We cannot say the result of defendant's trial clearly would have been otherwise had the trial court given the instruction on involuntary manslaughter with the underlying offense of simple assault. The first assignment of error is overruled.
 {¶ 14} In her second assignment, Ms. Davis contends the trial court denied her a fair trial by not instructing the jury that she had no duty to retreat from a cohabitant in her home. The trial court instructed the jury in pertinent part:
 {¶ 15} "To establish self-defense the defendant must prove (A) she was not at fault in creating the situation giving rise to the event in which the death of Brent Ingram occurred; and (B) she had reasonable grounds to believe and an honest belief that she was in imminent danger of death or great bodily harm and that her only means of retreat, escape, or withdrawal from such danger was by the use of deadly force and (C) she had not violated any duty to retreat, escape, or withdraw to avoid the danger. The defendant had a duty to retreat if (A) the defendant was at fault in creating the situation giving rise to the incident causing the death of Brent Ingram; or (B) the defendant did not have reasonable grounds to believe and an honest belief, that she was in imminent danger of death or great bodily harm, and that her only means of escape from the danger was by the use of deadly force. But if the defendant retreated or withdrew from the situation and no longer participated in it, she no longer had a duty to retreat. And if the defendant had reasonable grounds to believe, and an honest belief that she was in imminent danger of death or great bodily harm, and that the only means of escape from that danger was by the use of deadly force, the defendant was justified in using deadly force even though she was mistaken as to the existence of the danger. If the defendant wasassaulted in her home, the defendant had no duty to retreat andcould use such means as are necessary to repel the assailant fromthe home even the use of deadly force provided that she hadreasonable grounds to believe, and an honest belief, that the useof deadly force was necessary to repel the assailant." (Emphasis added).
 {¶ 16} The State argues that the trial court's instruction informed the jury in clear and concise language that Ms. Davis had no duty to retreat if she was assaulted in her home. We agree that it did. The second assignment is likewise overruled.
 {¶ 17} In her third assignment, Ms. Davis contends the trial court erred to her prejudice by excluding evidence of Ingram's propensity for threatening and violent behavior toward her and thus denied her a fair trial. Ms. Davis says the trial court improperly redacted portions of her tape-recorded statement to the police where she discussed prior violent conduct by Ingram toward her. The State argues that Ms. Davis failed to object to the trial court's ruling and has therefore waived all but plain error regarding the exclusion of the evidence. We can find no evidence in the record of a timely objection to the redaction of portions of the defendant's recorded statement. The following occurred prior to Ms. Davis testifying at trial.
 {¶ 18} "Judge: Alright. Let's also talk about the video tape — it's my understanding that the portions of the video tape confession of the Defendant with regard to any prior instances of violence between the parties will be redacted. Is that correct?
 {¶ 19} "Ms. Hobson: That correct Your Honor.
 {¶ 20} "Judge: Ms. Hobson, I'm sorry.
 {¶ 21} "Ms. Hobson: That's correct Your Honor.
 {¶ 22} "Judge: And Mr. Vannoy?
{¶ 23} "Mr. Vannoy: That's correct Your Honor. (Emphasis added).
 {¶ 24} "Judge: And there are two references — one at — and do you recall what minute — that section — the first instance was?
 {¶ 25} "A. I didn't get to it. I'll have to review it again to determine that Ma'am.
 {¶ 26} "Judge: Alright. The second area of questioning started at 37 minutes. The other questioning was only about a 30 second, if that long, statement and if we can just que that up before the jury comes in so that I can make sure that we have Amy stop that — at an appropriate time — if you want to go ahead and do that now. . . . . You can stop it. Okay, go ahead. Okay. Right there so it's about 13 minutes and 45 seconds. Alright. And when we show that to the jury, I'm going to have that moved over here so hopefully we don't have to have it turned up so loud so they can hear it. Because back here, I don't know that they're going to be able to understand it. Alright? So we'll move it up here. Anything further we need to do before we get started?"
 {¶ 27} Ms. Davis also does not inform us of the specifics of the redacted matter so that we might apply the plain error rule to the court's ruling. The State argues that Ms. Davis only referred generally to previous domestic disputes in the redacted portions of the tape. The State says Ms. Davis stated that Ingram had been arrested for domestic violence and had been "trespassed" from her apartment but no other details of the dispute were mentioned on the tape. We agree that the defendant has waived any error in the trial court's redaction of portions of defendant's confession. Those matters redacted do not constitute plain error either. The third assignment of error is overruled.
 {¶ 28} In her fourth assignment, Ms. Davis contends that her conviction was based on insufficient evidence as a matter of law. She contends that the undisputed evidence presented demonstrated that she did not knowingly inflict serious physical harm on Ingram. She notes that she testified that she did not try to harm Ms. Ingram. The State argues that the intensity with which Ms. Davis inflicted the fatal wound upon Ingram demonstrated that she was aware that her conduct would probably cause the result she achieved. The State notes that the forensic evidence revealed that Ms. Ingram shoved the eight inch knife into Ingram's leg almost as far as it could go. The State notes that Dr. Casto found that the knife severed a large artery and vein behind Ingram's knee causing him to bleed to death.
 {¶ 29} The relevant inquiry in determining the sufficiency of the evidence is whether any rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, 173, 574 N.E.2d 492. An appellate court should not disturb the verdict unless it finds that reasonable minds could not reach the conclusion reached by the trier of fact. Id.
 {¶ 30} We agree with the State that reasonable jurors could have found beyond a reasonable doubt that Ms. Davis "knowingly" caused serious physical harm to Ingram proximately causing his death and also knowingly caused physical harm to Ingram by use of a deadly weapon proximately causing his death. The appellant's fourth assignment of error is overruled.
 {¶ 31} The judgment of the trial court is Affirmed.
Wolff, J., and Fain, J., concur.