OPINION
{¶ 1} This is an appeal from a decision of the Montgomery County Common Pleas Court denying Augustus Williams a new trial.
 {¶ 2} In the fall of 1985, Williams was convicted of aggravated murder, kidnaping, and aggravated robbery in the disappearance and death of Mary Perrine. We affirmed Williams' conviction and soon after, affirmed the denial of his first motion for a new trial. State v. Williams (January 28, 1987), Montgomery App. No. 9597, 9815, unreported. State v. Williams
(August 13, 1987), Montgomery App. No. 10382, unreported.
 {¶ 3} In January of 2000, Williams filed a petition for post-conviction relief in which he alleged that William Quisenberry, a key witness for the prosecution at the trial, had recanted his testimony. The trial court denied the petition but converted it into a motion for a new trial. The court held hearings on May 3 and August 22, 2002 and denied the motion on March 11, 2003. Williams has appealed from that decision.
 {¶ 4} The facts underlying Williams' convictions in 1985 are set out in Williams' direct appeal and will not be repeated here.State v. Augustus Williams (January 28, 1987), Montgomery App. Nos. 9597, 9815. Williams' first motion for a new trial contended that the discovery of the victim, Mary Perrine's body and the resultant autopsy significantly contradicted the testimony of William Quisenberry, the juvenile accomplice of Williams, who testified as a State's witness in the trial. In affirming the trial court's denial of a new trial, we held that the autopsy findings of Dr. Donald E. Schaffer, "merely impeached or contradicted" the testimony of William Quisenberry, and, as such, it was legally insufficient to warrant a new trial. Furthermore, we held that the newly discovered evidence did not disclose a strong probability that it would change the result if a new trial were granted. See, State vs. Augustus Williams (August 13, 1987), Montgomery App. No. CA 10382.
 {¶ 5} Williams' second new trial motion was based on letters William Quisenberry sent to Williams' mother in 1992 and to Augustus Williams in 1997. In the letter to Williams' mother, Betty Williams, Quisenberry told her he could no longer live with the realization that he had put an innocent man behind bars with his trial testimony. He told Mrs. Williams in the letter that he lied at the trial that her son had shot Mrs. Perrine and he did not know whether Williams had committed the crime or not. He also stated that Michael Pullen, another suspect in the investigation, had threatened him and offered him money to bring Williams into the crime. In January and February 1997, Quisenberry wrote Williams and told him he was intimidated by the police into testifying against him. He told Williams he didn't know whether Williams was involved in the Perrine homicide. In the letter, Quisenberry tells Williams he was shocked to get a phone call from him and he asks for Williams' forgiveness. In the second letter to Williams, Quisenberry again stated the police scared him and they made him lie and admit to something he didn't know anything about. He said I know my testimony did not "match up with the autopsy."
 {¶ 6} In overruling Williams' second motion for a new trial, the trial court noted that the letters were inconsistent between themselves and directly contradict Williams' trial testimony and other statements he has given others. The trial court then noted:
 {¶ 7} "These letters, in total, completely contradict the sworn testimony of Quisenberry at trial, as well as his sworn statement given to prosecutors before trial on May 23, 1985. In both instances, Quisenberry admitted to participation in the crimes and contended that Williams was the primary instigator. Quisenberry contradicted himself again with a sworn statement made on August 5, 2001, to Don Otto, the Chief Investigator with the Montgomery County Prosecutor's Office and Wade Lawson, a former City of Dayton Detective who was involved in the original 1985 investigation. In the August 2001 statement, Quisenberry stated that the letters were written to avoid harm from Williams' family, that the trial testimony was accurate, and that Williams was involved in the death of Mary Perrine. However, Quisenberry retracted this sworn statement two months thereafter on October 23, 2001, in another written statement given to Williams at the Montgomery County jail, contending he had been pressured by prosecutors and the investigators in question and that the August 6, 2001, statement was in error. He did not allege in that statement which version of the facts given in the 1992 and 1997 letters is correct. Wade Lawson, who had interviewed Quisenberry during the original investigation, testified during the August 22, 2002, hearing that none of the police irregularities alleged by Quisenberry in the 1997 letters occurred. The extent of Quisenberry's testimony during the evidentiary hearings was to acknowledge authorship of the 1992 letter. He did not acknowledge authorship of the 1997 letter before exercising his Fifth Amendment privilege against self-incrimination.
 {¶ 8} "The question before the court is not whether or not there was sufficient evidence at the original trial to convict the Defendant-Petitioner-the jury and the Court of Appeals have answered that. The only question is whether the statements of Quisenberry disclose a strong probability of a different result at a new trial.
 {¶ 9} "Considering the trial testimony, the letters, and the sworn and unsworn statements, it is impossible to tell what his testimony would be at any new trial and even more impossible to find what effect, if any, it would have on the trier of fact. Given the preceding, no `strong probability' exists, as required by Petro, supra, that a different result will occur if a new trial is ordered. The consistent contradictions of Quisenberry's assertions leave the evidence without credibility. As the firstPetro requirement cannot be satisfied, the Motion for a New Trial cannot be granted.
 {¶ 10} "Further, assuming, arguendo, that any of Quisenberry's scenarios were believed by a jury, they merely allege an absence of knowledge by Quisenberry as to who
committed the crime. Such testimony (if in fact, it would be offered and Quisenberry would not choose to remain silent as he did at the hearing on this motion) again does not create the `strong probability' required by Petro that the result would be different at a new trial, since sufficient evidence was presented at the original trial to support the Defendant-Petitioner's conviction."
 {¶ 11} In his first assignment, Williams contends the trial court erred in not granting his new trial motion. Williams argues that in light of the letters sent by Quisenberry to his mother and to him, it is likely that Quisenberry would assert the Fifth Amendment if a new trial were ordered. In the alternative, Williams argues that if Quisenberry again testifies as he did in the original trial, he would be impeached by the contradictory statements he has given since the first trial.
 {¶ 12} The State for its part argues that Williams should not get a new trial unless he demonstrated to the trial court that Quisenberry testified falsely at the trial. The State argues that Quisenberry's trial testimony was credible but his recantations were not. The State notes the recantations were not made under oath and contradict each other. The State notes that Quisenberry wrote Mrs. Williams that he testified falsely against her son because Michael Pullen threatened him, but told Williams in the 1999 letter that he testified against Williams because detectives threatened they would "kick his ass."
 {¶ 13} A motion for a new trial pursuant to Crim.R. 33(B) is addressed to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. State v.Schiebel (1990), 55 Ohio St.3d 71.
 {¶ 14} On a motion for a new trial upon grounds of newly discovered evidence, the trial court, when considering the recantation of the prosecution's primary witness, must make two findings: (1) which of the contradictory testimonies of the recanting witness is credible and true, and if the recantation is believable, and (2) would the recanted testimony have actually affected the outcome of the trial? Toledo v. Easterling (1985),26 Ohio App.3d 59.
 {¶ 15} In evaluating the letters of Quisenberry, the trial court noted Quisenberry's letters were themselves inconsistent and contradicted his sworn testimony at trial and a sworn statement he gave to prosecutors in May 1985 shortly before the trial. The trial court also noted that Quisenberry disavowed the letters in a sworn statement given to Detective Wade Lawson in August 2001. In that statement, Quisenberry stated the letters were written to avoid harm from the Williams' family. Then in October 2001, Quisenberry retracted the statement he gave Detective Lawson contending he had been pressured by the prosecution and investigators to retract the recantation he made in the letters to Ms. Williams and Augustus Williams. The court noted that Detective Lawson testified at the motion hearing that none of the police irregularities alleged by Quisenberry in the 1997 letters occurred.
 {¶ 16} The trial court then concluded that the "consistent contradictions" of Quisenberry's assertions leave the evidence without credibility. The trial court thus concluded that the newly discovered evidence presented by Augustus Williams did not disclose a strong probability of a new result if a new trial were granted, citing State v. Petro (1947), 148 Ohio St. 505.
 {¶ 17} The credibility of witnesses is normally within the province of the trial judge and the trial court may in the exercise of its discretion determine a recantation to be false. Courts have long regarded newly discovered evidence which purports to recant sworn trial testimony with the utmost suspicion. Taylor v. Ross (1948), 150 Ohio St. 448. The Supreme Court in that case noted that a defendant is not entitled to a new trial merely because an important state's witness recanted his or her testimony. The determination of such matters, the court noted, lies within the sound discretion of the trial court, and appellate courts should not set aside that determination absent clear
 {¶ 18} and manifest abuse. Clearly, the trial court did not manifestly abuse its discretion in determining that Quisenberry's recantation was not credible. Accordingly, the appellant's first assignment of error is overruled.
 {¶ 19} In his second assignment of error, Williams contends the trial court erred in permitting attorney Thomas Kollin to assert the attorney-client privilege concerning conversations Kollin had with Quisenberry at the jail prior to the hearing. Specifically Williams wished to ask Kollin if Quisenberry hadn't told him that he had lied at the trial concerning Williams' involvement in Mary Perrine's death.
 {¶ 20} There is evidence in the record to support the trial court's finding that Kollin had an attorney-client relationship with Quisenberry. Kollin testified he believed such a relationship existed. (Tr. 50). Kollin did not inform Quisenberry that he represented Augustus Williams. (Tr. 54). The trial court found that Kollin engaged in conversations with Quisenberry without making it clear that he did not represent him and that their conversations would not be privileged. Accordingly, the trial court ruled that Kollin could not testify about those conversations absent Quisenberry's express waiver of the attorney-client privilege.
 {¶ 21} It is well settled that the attorney-client privilege protects communications between an attorney and the client made for the purpose of obtaining legal advice. State ex rel. Nix v.Cleveland (1998), 83 Ohio St.3d 379, 383, 700 N.E.2d 12; TBCWestlake, at 62-63, 689 N.E.2d 32; State ex rel. Thomas v. OhioState Univ. (1994), 71 Ohio St.3d 245, 249, 643 N.E.2d 126,129-130. Where a person approaches an attorney with the view of retaining his services to act on the former's behalf, an attorney-client relationship is created, and communications made to such attorney during the preliminary conferences prior to the actual acceptance or rejection by the attorney of the employment are privileged communications. State ex rel. Nix. v. Cleveland,83 Ohio St.3d at 383, 700 N.E.2d at 16, quoting Taylor v.Sheldon (1961), 172 Ohio St. 118, 15 O.O.2d 206, 173 N.E.2d 892, paragraph one of the syllabus.
 {¶ 22} We see no abuse of discretion in the trial court's ruling. In any event, Kollin's testimony would have been hearsay and at best merely cumulative. The trial court's ruling, even if erroneous, was harmless in light of the trial court's rationale for finding Quisenberry to be less than a credible person. The second assignment of error is overruled.
 {¶ 23} In his final assignment, Williams contends the trial court erred in permitting Quisenberry to assert the Fifth Amendment when called to testify on Williams' behalf at the motion hearing.
 {¶ 24} Williams called Quisenberry to the stand at the first hearing, May 3, 2001. The night before, the State's attorney, Leon Daidone, talked with Mr. Quisenberry. At the hearing, Quisenberry asked for an attorney. A lawyer that he had used previously was available. After consulting the attorney, Mr. Quisenberry identified a letter to Mr. Williams' mother, Exhibit A. He was then asked to identify additional letters, and Quisenberry attempted to invoke his Fifth Amendment Privilege.
 {¶ 25} "THE COURT: Okay. But as we talked about in chambers — and I haven't read these — I have but for the purposes of the record, the contents of these letters themselves may bring up the issues of self-compelled self-incrimination that Mr. Quisenberry is raising the Fifth Amendment because of Mr. Carter, is that your position.
 {¶ 26} "MR. CARTER: That's my opinion.
 {¶ 27} "THE COURT: — in talking to him? And as we talked about in chambers extensively this morning and this afternoon, you believe based on your conversations with your client and all the conversations with the prosecutor and defense attorneys, that there is a good faith basis for Mr. Quisenberry to take the Fifth Amendment at this time?
 {¶ 28} "MR. CARTER: Yes, I do, Your Honor.
 {¶ 29} "THE COURT: And, Mr. Avellano, you believe that there is not.
 {¶ 30} "MR. AVELLANO: That's correct. And I would like an opportunity to ask a few more questions of the witness, and he may invoke his Fifth if he needs to. But I do think there are a couple more questions that I could ask to see whether or not those additional questions would wind up with him invoking his Fifth."
 {¶ 31} Quisenberry's counsel, Mr. Carter, stated he was advising his client to invoke the Fifth Amendment because "questions relating to whether or not Quisenberry recognized the letters or authored the letters which recanted his trial accusation against Williams would go directly to whether he would self-incriminate himself." (Tr. 21).
 {¶ 32} Williams' counsel, Andrew Avellano, argued that Quisenberry was in no danger of being prosecuted because of his motion hearing testimony because the statute of limitations had expired for prosecuting him for committing perjury at the 1985 trial of Williams. The prosecutor, Leon Daidone, argued that the statute had not expired for prosecuting Quisenberry for perjury at the 1985 trial and also that Quisenberry could be prosecuted if he lied at the motion hearing. The court then ruled that Quisenberry had lawfully asserted his Fifth Amendment privilege.
 {¶ 33} Williams contends the trial court erred in permitting Quisenberry to assert the privilege because he failed to demonstrate a substantial and real hazard of incrimination should he testify as Williams' witness.
 {¶ 34} A prosecution is barred unless it is commenced for a felony within six years of the offense. R.C. 2901.13(A)(1)(a). The period of limitations shall not run during anytime when the corpus delicti remains undiscovered. R.C. 2901.13(F).
 {¶ 35} It is at least arguable that if Quisenberry testified under oath at the new trial hearing differently than he did at the trial, he could be prosecuted for perjury because the limitations period would have been tolled until the State "discovered" the perjury.
 {¶ 36} In State v. Climaco, Climaco, Seminatore, Lefkowitz Garofoli Co., L.P.A. (1999), 85 Ohio St.3d 582, the Ohio Supreme Court, however, appeared to "gut" the delayed discovery tolling provision of R.C. 2901.13(F). In that case, decided without benefit of a syllabus, the Supreme Court held that the defendants could not be prosecuted for a falsification made more than two years before the prosecution commenced despite the fact the falsification remained undiscovered for a substantial period during the two year limitations period. In a strong dissent, Chief Justice Moyer joined by Justice Cook noted that the majority "has, in fact, read it (subsection F) out of the statutory scheme."
 {¶ 37} Assuming that Quisenberry could not be prosecuted for perjury in the 1985 trial in the event he testified differently in the new trial hearing, nonetheless he was at risk for being prosecuted for perjury if he lied at the new trial hearing.
 {¶ 38} Although the trial court was not privy to Quisenberry's conversations with his counsel, Jay Carter, on the date of the new trial hearing, presumably Quisenberry told Carter about his sworn statement to Detective Lawson in 2001 where he disavowed the contents of the letters to Williams and his family. Carter presumably counseled Quisenberry that the State might prosecute him for perjury if it had a basis for believing he lied at the new trial hearing concerning Williams' involvement in the homicide of Mary Perrine.
 {¶ 39} We cannot say that the trial court abused its discretion in ruling that Quisenberry had a substantial basis for asserting his Fifth Amendment privilege. This is particularly true since Carter may have been privy to confidential information from Quisenberry which he could not disclose because of the attorney-client privilege. Accordingly, the third assignment of error is overruled.
 {¶ 40} The judgment of the trial court is affirmed.
Wolff, J., and Young, J., concur.