The STATE of Ohio, Appellee,

v.

ARNOLD, Appellant.

[Cite as *State v. Arnold,* 189 Ohio App.3d 507, 2010-Ohio-5379.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 23155.

Decided Nov. 5, 2010.

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Carley J. Ingram and Melissa M. Ford, Assistant Prosecuting Attorneys, for appellee.

Jon Paul Rion, for appellant.

GRADY, Judge.

{¶ 1} Defendant, China Arnold, appeals from her conviction, following a jury trial, of aggravated murder and the sentence of imprisonment for life without possibility of parole imposed for that offense.

{¶ 2} In the early morning hours of August 30, 2005, four-week-old Paris Talley died after she was placed in a microwave oven and its power was turned on for approximately two minutes. The child's mother, Arnold, was charged more than one year later, in December 2006, with aggravated murder arising from her daughter's death after the cause of Paris Talley's death was determined.

{¶ 3} A jury trial commenced in late January 2008. The state offered circumstantial evidence implicating Arnold in the crime, largely in relation to her access to her child when the crime occurred. Arnold's defense was that following an evening of drinking, she was too intoxicated to have committed the crime. The state also offered evidence that on the night of her daughter's death, Arnold had said, "I killed my baby." However, Arnold had also explained that her statement expressed remorse for not taking care to prevent someone else from committing the crime. The state also offered the testimony of Linda Williams, a "jailhouse snitch," who testified that Arnold admitted putting her child in the microwave.

{¶ 4} The trial ended in a mistrial when the defense proffered newly discovered evidence that another person, D.T., Arnold's young nephew, put the baby in the microwave oven and turned it on. The proffered evidence was in the form of testimony by M.Q., an eight-year-old boy, who claimed to have witnessed D.T. do so.

{¶ 5} A second trial commenced in August 2008. The state again presented its evidence. Linda Williams's testimony was offered in the form of a video recording of her testimony in the first trial because she could not be located. M.Q. testified that he saw D.T. put the baby in the microwave oven and turn it on.

{¶ 6} The defense wished to call two additional witnesses in connection with their defense that it was D.T., not defendant, who put the baby in the microwave. Demetri Miles and Terry McDonald would testify that D.T. told them he had placed the baby in the microwave. If offered to prove the truth of that assertion by D.T., the testimony of the two witnesses was inadmissible hearsay. The defense therefore intended to offer the evidence to impeach D.T.'s credibility should he be called as a witness by the defense and deny making the statement. However, Evid.R. 607(A) would preclude the defense from doing that because, being aware that D.T. had more recently denied making the statement to Miles and McDonald, the defense could not demonstrate surprise. The state expressed no intention to call D.T. as its witness. The defense asked the court to call D.T. as a court's witness, which would allow his impeachment by the defense. Evid.R. 614. The court denied the request. The testimony of Miles and McDonald was instead proffered.

{¶ 7} The jury returned a guilty verdict on the crime of aggravated murder charged in the indictment. The offense was charged as a capital crime. On the day the jury began its deliberations in the sentencing phase, defendant filed a motion for new trial. At a hearing on the motion, defendant offered the testimony of Linda Williams, who recanted her testimony from the first trial that defendant had admitted that she put her baby in the microwave. Defendant also offered the testimony of Demetri Miles and Terry McDonald that police and prosecutors had coerced them into recanting their statements concerning what D.T. had told them. The court denied the motion for a new trial.

{¶ 8} The jury deadlocked in the sentencing phase. The trial court therefore imposed a sentence of life without the possibility of parole. Defendant appeals from that final judgment.

## FIRST ASSIGNMENT OF ERROR

{¶ 9} "The trial court denied appellant a fair trial and the right to a trial by jury as guaranteed under the state and federal constitutions when it refused to grant the new trial motion based on newly discovered evidence."

{¶ 10} A new trial may be granted on the motion of the defendant when new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial, and the evidence newly discovered affects the defendant's substantial rights. Crim.R. 33(A)(6).

{¶ 11} We review decisions granting or denying a motion for new trial on an abuse-of-discretion standard. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 564 N.E.2d 54.

{¶ 12} " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary, or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redev.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597, quoting *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 87, 19 OBR 123, 482 N.E.2d 1248.

{¶ 13} "To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Petro* (1947), 148 Ohio St. 505, 36 O.O. 165, 76 N.E.2d 370, syllabus.

{¶ 14} Construing the holding in *Petro*, in *Dayton v. Martin* (1987), 43 Ohio App.3d 87, 539 N.E.2d 646, we held that while *Petro* "stands for the proposition

that newly discovered evidence that *merely* impeaches or contradicts other evidence is not enough to warrant the granting of a new trial, *Petro* does not establish a per se rule excluding newly discovered evidence as a basis for a new trial simply because that evidence is in the nature of impeaching or contradicting evidence. The test is whether the newly discovered evidence would create a strong probability of a different result at trial." (Emphasis sic.) Id., syllabus. See also *State v. McConnell*, 170 Ohio App.3d 800, 2007-Ohio-1181, 869 N.E.2d 77.

{¶ 15} Linda Williams was called by the state as its witness in the first trial. Her testimony, which was recorded by video, was played for the jury in defendant's second trial after Williams could not be located. Williams testified that she and defendant shared a cell in the Montgomery County jail in March 2007. On or about March 27, 2007, they had a conversation concerning the death of Paris Talley. Defendant told Williams that she and Paris Talley's father had an argument concerning Paris Talley's paternity in which the father disputed his parentage and threatened to leave their home. After he walked out, defendant became intoxicated and also left the house. When she later returned, defendant went to sleep. She was awakened by the father's cries that Paris Talley wasn't breathing. Defendant went back downstairs. When asked about her conversation with defendant concerning "any other events," Williams replied:

{¶ 16} "Yeah, I asked her did she do it. And she told me that—first, she said she didn't remember. And then on the second occasion, she told me then. She put the baby in the microwave and started it and left her house."

{¶ 17} Williams further testified that she and defendant spoke again about the matter early the following morning, when defendant awakened Williams before breakfast. Williams testified that defendant "said that she had put her baby in the microwave, and I asked her, I said, how'd you—did she—I said, how did you get her in there? She said, she fit right in. I got really furious and upset, and I wanted to leave." Williams added that defendant told Williams she turned the microwave on and "left out the door." Williams asked defendant how she got the baby in microwave. Williams stated that defendant said "she fit right in."

{¶ 18} Williams was asked whether defendant gave a reason for killing her child. She replied that defendant "said that her kids' father said that if the baby wasn't his, that he was leaving her." Williams added that defendant "was more concerned about the baby not being his than anything in the world. That's what she was more concerned about."

{¶ 19} Williams testified that she spoke with Dayton Police Detective Galbraith on the following day about her conversations with defendant. Williams made no mention of defendant's admissions that she put her baby in the microwave, telling Detective Galbraith that defendant didn't know what had happened to her child. Some months later, in an interview with representatives of the police and the

prosecutor's office, Williams related defendant's admissions that she put her baby in the microwave. When asked why she hadn't told Detective Galbraith, Williams testified that she and defendant had become close and that she had later revealed defendant's admissions because of the heinous nature of the crime and defendant's lack of remorse: "I just want to tell the truth.  * * *  I'm here for the baby. That's it."

{¶ 20} On cross-examination, Williams testified that she told Detective Galbraith that defendant "didn't remember at the time" that Paris Talley was killed what had happened to the baby. Williams said that when she was asked whether defendant said anything else, she "told them no." When asked whether there is "anything else about this case you know," Williams replied, "No, just what I told you today."

{¶ 21} Defendant was found guilty of aggravated murder at the second trial, on August 29, 2008. On September 2, 2008, defendant filed a motion for a new trial. The motion averred that Linda Williams had on that date called counsel for defendant from the Montgomery County jail, saying that she was "ready to tell the truth." In an attached affidavit defense counsel averred:

{¶ 22} "1.  I have interviewed Linda Williams this day and the statements made during that interview are in total and complete contradiction to the testimony given at the previous trial;

{¶ 23} "2.  Linda Williams related to me that foul play was committed in this case by investigators at the Montgomery County Prosecutor's Office reference promises made to her.

{¶ 24} "3.  Further, affiant saith naught."

{¶ 25} To the extent that the affidavit stated that counsel first learned of the matters that the affidavit concerned on September 2, 2008, the trial court could reasonably conclude that those matters were discovered since the trial and could not in the exercise of due diligence have been discovered before the trial. *State v. Petro*, 148 Ohio St. 505, 36 O.O. 165, 76 N.E.2d 370. However, and with regard to those matters, the affidavit fails to contain any operative facts that the court could find are material to defendant's guilt or innocence and is wholly conclusory. The court could have overruled the motion for that reason, but it did not. Instead, the court exercised its discretion to set the motion for an evidentiary hearing. The hearing was held on November 3, 2008, following imposition of defendant's life sentence on September 9, 2008.

{¶ 26} Linda Williams testified at the hearing on the motion for a new trial that everything she told Detective Galbraith was "true" and that defendant said she couldn't remember what had happened to Paris Talley on the night of her death. Williams testified that she later told police and prosecutors of defendant's

admissions that defendant had put her baby in the microwave because Williams was frightened of them and "just told them * * * what they wanted to hear." Williams said she was frightened that she would otherwise be arrested and her children would be taken from her. Williams testified that defendant never said she put her baby in the microwave.

{¶ 27} On cross-examination, Williams at first denied telling police and prosecutors that defendant admitted committing the crime. When pressed concerning whether she made such statements to police, Williams said, "I can't remember whether I told them that or not." Williams then backed off that assertion and said that "it's possible." She added, "I was under psych meds. A lot of things I can't remember." When asked whether it was possible she had related defendant's admissions to police and prosecutors, Williams replied: "I just told you, anything is possible."

{¶ 28} Much of the remainder of Williams's testimony in support of defendant's motion for a new trial involved alleged threats by prosecutors and police and a claim that a prosecutor's office investigator had beat her. Williams claimed that a prosecutor's office investigator told her not to speak with defense counsel when a meeting was arranged prior to her trial testimony, but also said, "[I]t's up to you whether you speak to them or not." Williams said that she complained to an investigator for the prosecutor "that Arnold's family was bothering" her, but then also said, "No, I never complained to him about the Arnolds at all."

{¶ 29} Donald Otto, chief investigator for the prosecutor's office, testified and denied Williams's claims of threats. Otto testified that his office had paid for secure housing for Williams and her children when she was the subject of threats following her trial testimony, from March 4 to April 23, 2008. When the threats subsided, that assistance was terminated. Williams asked for assistance with her first month's rent and a security deposit for new housing. That was refused. After that, Williams disappeared and could not be located to testify at the second trial, though she had been subpoenaed months before. Williams testified that she went to Kentucky and then to Alabama. She contacted Otto by cell phone when she returned to Dayton the month prior to the second trial but wouldn't say where she was. Williams promised several times to come to the prosecutor's office, but she never appeared.

{¶ 30} "On a motion for new trial based upon grounds of newly discovered evidence, the trial court, when considering the recantation of the prosecution's primary witness, must make two findings: (1) which of the contradictory testimonies of the recanting witness is credible and true, and if the recantation is believable; (2) would the recanted testimony have materially affected the outcome of the trial?" *Toledo v. Easterling* (1985), 26 Ohio App.3d 59, 26 OBR 233, 498 N.E.2d 198, paragraph three of the syllabus. Accord *State*

*v. Williams,* Montgomery App. No. 19854, 2004-Ohio-3135, 2004 WL 1363261. "[N]ewly discovered evidence which purportedly recants testimony given at trial is 'looked upon with the utmost suspicion.'" *State v. Isham* (Jan. 24, 1997), Montgomery App. No. 15976, 1997 WL 24794.

{¶ 31} The trial court denied defendant's motion for a new trial, finding that Williams's testimony at the hearing on the motion "contains numerous internal contradictions, outlandish exaggerations, and nonsensical explanations, that her recantation is unbelievable." On appeal, defendant "concedes that Williams' testimony was at times contradictory and even incredible, (but) just as surely submits that on this factual background, this is no indication that Williams' recantation was unbelievable." Defendant argues that these same "embellishments and misstatements * * * just as clearly cast doubt on the entirety of her testimony." Defendant also points to other matters introduced at trial that cast doubt on her culpability, principally the evidence that D.T. committed the crime.

{¶ 32} We cannot find that the trial court abused its discretion when it rejected Williams's testimony as a basis to grant defendant's motion for a new trial. The test is whether Williams's evidence would create a strong probability of a different result at trial. *Dayton v. Martin,* 43 Ohio App.3d 87, 539 N.E.2d 646. The lynchpin of Williams's testimony was her recantation concerning the admissions of defendant to which Williams had testified at trial. Yet Williams could not say whether she had ever related those admissions to police and prosecutors, and she said that there were "[a] lot of things [she] can't remember." Whether Williams related those admissions to police and prosecutors is, in relation to the issue of her credibility, as significant as whether defendant in fact made those admissions to Williams. Williams's statement, "Anything is possible," and her use of antipsychotic medications for many years likewise seriously undermine her credibility. We cannot find that the trial court's conclusion that Williams's testimony would not create a strong possibility of a different result at a new trial was unreasonable, arbitrary, or unconscionable. The first assignment of error is overruled.

## SECOND ASSIGNMENT OF ERROR

{¶ 33} "The trial court erred by not allowing evidence of D.T.'s involvement in the crime."

{¶ 34} The out-of-court statement that Demetri Miles and Terry McDonald attributed to D.T., that it was D.T. who had put Paris Talley in the microwave and caused her death, is a statement against D.T.'s penal interest.[1]

---

1. The record does not reflect D.T.'s age. The parties suggested at oral argument that he was approximately ten to 12 years of age when the alleged admissions were made.

Therefore, evidence of D.T.'s out-of-court statement was admissible through the hearsay testimony of Miles and McDonald to prove the truth of D.T.'s statement as an exception to the rule against hearsay so long as D.T. was unavailable to testify. Evid.R. 804(B)(3). D.T. was not unavailable, however, because he could have been called to testify by either party. Neither called him.

{¶ 35} Had the state called D.T. as its witness to rebut M.Q.'s testimony that he saw D.T. put the baby in the microwave, defendant would have been free to ask D.T. on cross-examination whether he made the statement attributed to him by Miles and McDonald admitting the crime. If D.T. in his "intrinsic" trial testimony denied making the statement, the defendant could then have impeached D.T.'s credibility with the "extrinsic" evidence of Miles and McDonald concerning the prior inconsistent statement to them that D.T. had allegedly made. Evid.R. 613(A). However, the state did not call D.T. as its witness, foreclosing that opportunity for his impeachment by a prior inconsistent statement.

{¶ 36} Had D.T. been called by the defense and, after waiving his testimonial privilege, denied making the statement to Miles and McDonald, Evid.R. 607 would preclude defendant from offering evidence of D.T.'s prior inconsistent statement, absent a showing of surprise. But defendant could not show surprise, because both the defense and the state were aware that D.T. had more recently denied making the alleged statement to Miles and McDonald. Defendant argues on appeal that the Evid.R. 607 bar should not prevent him from offering the testimony of Miles and McDonald. Defendant relies on the holding in *Chambers v. Mississippi* (1973), 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297.

{¶ 37} The defendant in *Chambers* was accused of a murder that he insisted was committed by McDonald. McDonald had signed a written confession and had also made incriminating statements to three other persons shortly after the crime occurred, but he had repudiated his confession by the time Chambers came to trial. The prosecution did not call McDonald at trial, but Chambers did, hoping to develop exculpatory evidence of his own guilt through introduction of McDonald's confession and evidence of his other admissions by way of impeachment, should McDonald continue to insist he was innocent. The trial court, relying on Mississippi's "voucher rule," which precludes a party from impeaching his own witness, denied Chambers the right to cross-examine McDonald and to introduce evidence of McDonald's three incriminating statements. Chambers was convicted.

{¶ 38} The Supreme Court reversed Chambers's conviction. The court held that Chambers's due-process right to present a complete defense was violated because evidence of McDonald's guilt would necessarily have exculpated Chambers and because evidence of the admissions McDonald made to the three

persons Chambers wished to call would "subsequently (be) offered at trial under circumstances that provided considerable assurance of their reliability." 410 U.S. at 300, 93 S.Ct. 1038, 35 L.Ed.2d 297. The Supreme Court pointed out that each of McDonald's three incriminating statements was made spontaneously to a close acquaintance shortly after the murder occurred; that each was corroborated by other evidence, including McDonald's written confession as well as the testimony of an eyewitness to the murder; and that the sheer number of the independent confessions provided additional corroboration. Further, the confessions were statements against his interest, and McDonald was available for cross-examination concerning them.

{¶ 39} In framing its analysis, the Supreme Court noted that McDonald, though he had been called as a witness by Chambers, was nevertheless a witness "against the accused" for purposes of the Sixth Amendment because, in the circumstances of the case, McDonald's retraction of his admissions inculpated Chambers to the same extent that it exculpated McDonald. Chambers therefore had a Fourteenth Amendment due-process right, in the exercise of his Sixth Amendment right, "to confront and cross-examine" McDonald. That due-process right trumped Mississippi's voucher rule. Chambers's due-process right would also allow him to call the three witnesses to whom McDonald made incriminating statements because they were witnesses "critical" to his defense and not merely to impeach McDonald. In that respect, the due-process right created an exception to Mississippi's rule against hearsay.

{¶ 40} Evid.R. 607 likewise enforces the "voucher rule." The state argues that, nevertheless, *Chambers* offers no basis to allow defendant to present the testimony of Demetri Miles and Terry McDonald because "considerable assurance of (the) reliability" of the statement D.T. allegedly made to them, which was present in *Chambers,* is lacking. D.T.'s alleged statement was spontaneous but was made at the same time to both Miles and McDonald. Neither was a close acquaintance of D.T., and while M.Q.'s eyewitness testimony implicated D.T. in the crime, M.Q.'s testimony did not rise to a level of corroboration comparable to McDonald's signed and sworn confession in *Chambers.*

{¶ 41} We are not required on this record to sort out those distinctions, however. Defendant's Sixth Amendment right of confrontation, which *Chambers* held was violated when the defendant was not allowed to cross-examine his own witness, McDonald, never came into play, because neither the state nor defendant ever called D.T. as a witness, and defendant was therefore not denied her right to confront D.T. through cross-examination. Neither was defendant denied her due-process right to call Miles and McDonald as witnesses critical to her defense, *Chambers,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297, to testify concerning what D.T. allegedly told them, because defendant never called Miles or McDonald as

witnesses at all. Instead, defendant's sole request was to call them to impeach D.T., should D.T. be called to testify. It was for that reason, perhaps, that defendant instead asked the court to call D.T. as a court's witness pursuant to Evid.R. 614(A), which states:

{¶ 42} "The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called."

{¶ 43} Evid.R. 614 is identical to Fed.R.Evid. 614, which has been adopted by a number of jurisdictions. Evid.R. 614 authorizes the court to call a witness whom a party might otherwise call, on the party's "suggestion" that the witness would then recant another, prior statement favorable to that party. *State v. Kiser*, Sandusky App. No. S–03–028, 2005-Ohio-2491, 2005 WL 1201210. The practice of calling a witness as a court's witness for that reason "is justified by the tendency of juries to associate a witness with the party calling him, regardless of the technical aspects of vouching." Annotation, Calling and Interrogation of Witnesses by Court under Rule 614 of the Federal Rules of Evidence, 53 A.L.R.Fed. 498, 500.

{¶ 44} "A trial court possesses the authority in the exercise of sound discretion to call individuals as witnesses of the court." *State v. Adams* (1980), 62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144, paragraph four of the syllabus. "It is well-established that a trial court does not abuse its discretion in calling a witness as a court's witness when the witness's testimony would be beneficial to ascertaining the truth of the matter and there is some indication that the witness's trial testimony will contradict a prior statement made to police." *State v. Schultz*, Lake App. No. 2003–L–156, 2005-Ohio-345, 2005 WL 238153, ¶ 29; *State v. Lather*, 171 Ohio App.3d 708, 2007-Ohio-2399, 872 N.E.2d 991, ¶ 3. When the court calls a witness on its own motion, a party need not satisfy the surprise and affirmative-damage requirements of Evid.R. 607(A) in order to impeach the witness. *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 514 N.E.2d 394.

{¶ 45} By authorizing the court to call a witness who may then be cross-examined by any party, Evid.R. 614 creates an exception to the limitation imposed by Evid.R. 607(A), barring a party's impeachment of its own witness with evidence of a prior inconsistent statement. However, "where impeachment is a mere subterfuge to get evidence before the jury which is not otherwise admissible, impeachment of a party's own witness has been held improper." 53 A.L.R.Fed. at 500–501. The fact that evidence offered for impeachment would otherwise be inadmissible does not necessarily portray a subterfuge, however. When the reason a party relies on for requesting the court to call a witness as a court's witness, rather than calling him as a witness itself, is to avoid being unable to test the credibility of the testimony the witness is expected to give by

use of his prior out-of-court statements, the request is not improper. *State v. Adams,* 62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144; *State v. Dacons* (1982), 5 Ohio App.3d 112, 5 OBR 227, 449 N.E.2d 507.

{¶ 46} Courts have held that a court witness's prior inconsistent statements may be used only to diminish the credibility of the witness and otherwise impeach his testimony and may not be used as substantive evidence. *McCloud v. State* (Fla.App.1978), 354 So.2d 407; *People v. Bailey* (1975), 60 Ill.2d 37, 322 N.E.2d 804. Further, the witness may be impeached by prior inconsistent statements only if his testimony was damaging to the examiner's case. *People v. Triplett* (1980), 87 Ill.App.3d 763, 42 Ill.Dec. 786, 409 N.E.2d 401.

{¶ 47} These limitations on the application of a rule like Evid.R. 614 reflect a concern that its cross-examination provision not swallow up the fundamental requirement imposed by Evid.R. 402 that in order to be admissible, evidence of a court's witness must be relevant; that is, the evidence must have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.

{¶ 48} In the present case, defendant anticipated that if called, D.T. would deny both committing the crime with which defendant was charged and that he had made the alleged admission to Demetri Miles and Terry McDonald. In and of themselves, such denials would be of no relevance in proving or disproving the charges against defendant. Defendant intended to use D.T.'s denial as a basis to offer the testimony of Miles and McDonald to impeach D.T., but defendant's true purpose was instead to offer the testimony of those two witnesses as substantive evidence of defendant's innocence. That application of Evid.R. 614 would be improper, being merely a pretext for the introduction of evidence that is otherwise inadmissible for that purpose. Evid.R. 607(A).

{¶ 49} Evid.R. 614 conforms with and implements the holding in *Chambers v. Mississippi.* Even there, however, the witness, McDonald, acknowledged his signed confession in his trial testimony before repudiating it. The repudiation was damaging to the defendant, Chambers, but only because the witness first acknowledged his confession. His repudiation made him a witness "against" the defendant, triggering both Chambers's right to cross-examine McDonald and his right to offer evidence of McDonald's prior inconsistent statements as substantive evidence of Chambers's innocence. Neither right would be triggered in the present case by D.T.'s anticipated testimony. The trial court did not abuse its discretion when it denied defendant's Evid.R. 614 motion to call D.T. as a court's witness in order to obtain those opportunities.

{¶ 50} The second assignment of error is overruled.

## THIRD ASSIGNMENT OF ERROR

{¶ 51} "Appellant's conviction should be reversed because the trial court allowed impermissible testimony of Linda Williams by the state, and further inhibited defendant from impeaching the impermissible testimony."

## FOURTH ASSIGNMENT OF ERROR

{¶ 52} "The court erred in not granting appellant a new trial due to numerous acts of prosecutorial misconduct."

{¶ 53} These two assignments of error present intertwined issues of fact and law regarding the trial testimony of Linda Williams. They will be considered together with respect to the error defendant assigns concerning Williams's testimony. Defendant also assigns error with respect to the court's exclusion of the testimony of another witness, Kyra Woods, whom defendant asked to call to impeach Williams. The error assigned regarding Woods is limited to the third assignment of error.

### A. *Linda Williams*

{¶ 54} Defendant was indicted on December 7, 2006. On December 12, 2006, defendant filed a Crim.R. 16 demand for discovery of the names and addresses of witnesses the state intended to call at trial. A further similar and more detailed request was filed on January 23, 2007.

{¶ 55} On May 31, 2007, defendant filed a motion to compel the state to provide a list of its witnesses. On June 4, 2007, the state filed a written list of the names and addresses of 73 witnesses. Linda Williams was one of the witnesses identified. The address provided for her was "c/o Detective Galbraith, Dayton Police Department." The same address was provided for a number of the other witnesses listed.

{¶ 56} Donald Otto, chief investigator for the Montgomery County prosecutor's office, testified at the hearing on defendant's motion for new trial that he was asked in January 2008 to locate Linda Williams and that he had obtained an address for her from jail records. Otto's first contact with Linda Williams was on January 7, 2008, when she voluntarily appeared at the prosecutor's office. Otto confirmed the address for Williams he had obtained from jail records. Williams's address was 76 Victor Avenue in Dayton. Otto served Williams a subpoena on that date to appear at trial on January 28, 2008. The subpoena identified Williams's address as "c/o Dan Otto, Montgomery County Prosecutor's Office." It was then that Williams told Otto that defendant Arnold had admitted killing her baby. Williams was interviewed on that date by police and prosecutors. Otto did not participate in the interview.

{¶ 57} On January 10, 2008, defendant filed another motion to compel discovery. Defendant complained that no actual addresses had been provided for many of the state's witnesses and that "[i]t is Defendant's belief that the prosecutor has the addresses for these individuals, but it has been reluctant to provide them." On the following day, January 11, 2008, the court ordered the state to file "a true and accurate witness list with criminal records provided or the case shall be dismissed."

{¶ 58} On January 27, 2008, Otto called Linda Williams at the 76 Victor Avenue address he had confirmed for her. Williams was crying and screaming, complaining that her boyfriend had assaulted her because he didn't want her to testify at defendant's trial. Otto called for police assistance. Williams, who was pregnant, was taken to a hospital for a physical examination. After Williams was discharged, Otto took her to a motel for her own safety. Early in the morning of January 28, 2008, Williams began having contractions and was returned to the hospital.

{¶ 59} On January 31, 2008, Williams was brought to the prosecutor's office prior to her testimony at trial on that date. Otto testified at the hearing on defendant's motion for new trial that he made Williams available to counsel for defendant for "several minutes" in Otto's office. Counsel were permitted to interview Williams alone, prior to her testimony at trial.

{¶ 60} Williams testified at defendant's trial on January 31, 2008, relating their conversation in which defendant admitted killing her baby. That trial terminated in a mistrial on February 13, 2008. Subsequently, because of threats Williams received, Otto arranged for Williams and her children to be housed in two motels from March to April 23, 2008. During that time, on March 25, 2008, Otto served Williams a subpoena to appear at defendant's second trial on August 11, 2008.

{¶ 61} Otto testified that his office stopped paying for Williams's hotel expenses on and after April 23, 2008, because her boyfriend had been arrested. When that funding stopped, Williams asked Otto for assistance in providing her first month's rent and security deposit for a new apartment. Williams became angry when Otto declined to do that, telling Otto that "she was going to Rion's (defense counsel's) office and get China out of jail." Otto had no further contact with Williams.

{¶ 62} Williams testified at the hearing on defendant's motion for a new trial that she thereafter left Montgomery County, going first to Kentucky and then to Alabama. Gary Ware, an investigator with the prosecutor's office, testified that he was assigned to locate Williams. He traced her to Mt. Sterling, Kentucky, where she used her food-stamp card but could not locate Williams on that basis. Ware's efforts to find Williams in Alabama through his contacts there were unavailing.

{¶ 63} Ware testified that on July 18, 2008, he received a cell phone call from Williams, who said she had returned to Dayton and was homeless. Williams declined to tell Ware her whereabouts. Ware knew only that Williams's last address was 76 Victor Avenue.

{¶ 64} Between August 11 and 20, 2008, Williams called Ware several more times, promising to come to the prosecutor's office, but she never did. Ware made no effort to find Williams during that period because of her promises to appear. Williams told Ware that "she had warrants" outstanding and "wanted to get those cleared up before she came in."

{¶ 65} Williams failed to appear at the second trial in response to the subpoena she was served. The state moved to have Williams found to be unavailable and her videotaped testimony from the first trial played for the jury pursuant to Evid.R. 804(B)(1). That rule creates an exception to the rule against hearsay, Evid.R. 802, when the declarant is unavailable and the out-of-court statement is in the form of "[t]estimony given as a witness at another hearing of the same or a different proceeding * * * if the party against whom the testimony is now offered * * * had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Absent that opportunity, the declarant's prior testimony is barred from introduction in evidence by the Confrontation Clause of the Sixth Amendment to the Constitution of the United States. *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 66} A declarant is "unavailable" if the declarant "is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance * * * by process or other reasonable means." Evid.R. 804(A)(5). Following a hearing, the court in the second trial found that Linda Williams was unavailable to testify and granted the state's Evid.R. 804(B)(1) motion, allowing the state to introduce and play for the jury Williams's testimony from the first trial implicating defendant in her baby's death. Defendant argues that the trial court abused its discretion in finding Williams unavailable. Defendant argues that the testimony of officers who did no more than "drive around the block to locate" Williams "fell short of the minimum requirements to establish the unavailability of a witness."

{¶ 67} Evid.R. 804(A)(5) imposes on the proponent of the hearsay an obligation to use "reasonable means" in attempting to procure the witness's appearance. In a criminal case, that requires more than merely serving process on the witness: the proponent must make "diligent efforts" to procure the witness's attendance at trial. Weissenberger's Ohio Evidence Treatise (2009 Ed.), Section 804.7. If a subpoenaed witness cannot be found after an investigator's attempts to locate

her, the witness may be considered unavailable. *State v. Bragg* (1981), 2 Ohio App.3d 193, 2 OBR 211, 441 N.E.2d 272.

{¶ 68} On August 20, 2008, the third day of trial, the court heard of Gary Ware's experiences with Linda Williams since her return to Dayton on July 18, 2008. Based on that, the court issued a material-witness warrant for Linda Williams. Deputy Gregory Schaeublin testified concerning his efforts to execute the material-witness warrant for Williams. Schaeublin testified that he went to 76 Victor Avenue as well as six other locations for which he had leads, but was unable to locate Williams.

{¶ 69} We cannot find that the trial court abused its discretion when it held that Williams was unavailable to testify. She had been subpoenaed on March 25, 2008, well in advance of the August 2008 trial. Williams cut off all her known contacts with Dayton by leaving for Kentucky and Alabama on March 23, 2008. Williams telephoned Gary Ware on July 17, 2008, telling him that she'd returned to Dayton, but wouldn't say where she was. Neither did Williams keep the appointments with Ware that she made. Ware did nothing more to locate her at that time. However, even if that may be viewed as negligence on his part, Evid.R. 804(B) requires more than mere negligence to defeat a showing of unavailability. "Only if the proponent of the hearsay intentionally procures the unavailability of the declarant is the reliability of the hearsay compromised." Weissenberger, Section 804.8. The trial court did not abuse its discretion in finding Williams unavailable to testify at the second trial.

{¶ 70} Defendant also argues, in support of her fourth assignment of error, that the state should not have been permitted to introduce Linda Williams's testimony from the first trial at the second trial because her "testimonial" declaration fails to satisfy the requirements of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, due to prosecutorial misconduct. We agree.

{¶ 71} "The test for prosecutorial misconduct is whether the prosecutor's acts were improper in their nature and character and, if they were, whether the substantial rights of the defendant to a fair trial were prejudiced thereby." *State v. McGonegal* (Nov. 2, 2001), Montgomery App. No. 18639, 2001 WL 1346024, citing *State v. Smith* (1984), 14 Ohio St.3d 13, 14 OBR 317, 470 N.E.2d 883. "A fair trial demands that the accused be tried on the evidence produced in open court by witnesses who can be confronted, cross-examined and rebutted." *State v. Young* (1966), 7 Ohio App.2d 194, 197, 36 O.O.2d 335, 220 N.E.2d 146.

{¶ 72} " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Linda Williams's testimony from defendant's first trial was hearsay for the purpose for which it was offered in the

second trial, which was to prove that defendant admitted killing her baby. The trial court admitted the evidence in the second trial pursuant to Evid.R. 804(B)(1), as testimony given by an absent declarant at another hearing.

{¶ 73} Being a testimonial declaration, Williams's statements were admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine" the declarant. *Crawford v. Washington,* 541 U.S. at 59, 124 S.Ct. 1354, 158 L.Ed.2d 177. That prior opportunity of cross-examination is a procedural requirement imposed by the Confrontation Clause, permitting the reliability of the evidence "to be assessed in a particular manner: by testing in the crucible of cross-examination." Id. at 61, 124 S.Ct. 1354, 158 L.Ed.2d 177. Further, the evidence "is admissible only if the defendant had an adequate opportunity to cross-examine." Id. at 57, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 74} Crim.R. 16(A) states that the purpose of the rules mandating discovery "is to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large." [2] The overall purpose of discovery is to ensure a fair trial. *Lakewood v. Papadelis* (1987), 32 Ohio St.3d 1, 511 N.E.2d 1138.

{¶ 75} Compliance with Crim.R. 16 eliminates, at least to some degree, trial by ambush by preventing surprise and the secreting of evidence favorable to one party. Baldwin's Ohio Criminal Law (3d Ed.), Section 49.3. In *Pennsylvania v. Ritchie* (1987), 480 U.S. 39, 61–62, 107 S.Ct. 989, 94 L.Ed.2d 40, Justice Blackmun, in a concurring opinion, indicated that the Confrontation Clause as well as the Due Process Clause applies to criminal discovery: "In my view, there might well be a confrontation violation if, as here, a defendant is denied pretrial access to information that would make possible effective cross-examination of a crucial prosecution witness."

{¶ 76} On December 12, 2006, and again on January 23, 2007, defendant asked the state for the names and addresses of witnesses that the state intended to produce at trial, pursuant to Crim.R. 16(B)(1)(e). The state filed a response on June 4, 2007, identifying 73 witnesses. Twenty-eight of those persons who were not police-department personnel were identified by name and "c/o Det. Galbraith,

---

2. This statement appears in the version of Crim.R.16 that became effective on July 1, 2010. It did not appear in the prior version of the rule that was in effect during defendant's two trials. We necessarily apply that prior version to the discovery issues herein. However, we believe that the policy statement in the revised rule illustrates the policy of the prior rule as well.

Dayton Police Department." Linda Williams was thus identified, twice, as witness numbers 46 and 70.

{¶ 77} Donald Otto, chief investigator for the Montgomery County prosecutor's office, obtained an address for Linda Williams from jail records in January 2008. On January 7, 2008, Williams came to the prosecutor's office, where she was interviewed by prosecutors and police. Otto testified that he served Linda Williams with a subpoena on that occasion and confirmed her address at the time. Williams's address was 76 Victor Avenue in Dayton. She remained at that location until she was assaulted by her boyfriend and was provided safe housing in a motel by Otto on January 27 or 28, 2008. Crim.R.16(D) then provided:

{¶ 78} "Continuing duty to disclose.

{¶ 79} "If subsequent to compliance with a request or order pursuant to this rule, and prior to or during trial, a party discovers additional matter which would have been subject to discovery or inspection under the original request or order, he shall promptly make such matter available for discovery or inspection, or notify the other party or his attorney or the court of the existence of the additional matter, in order to allow the court to modify its previous order, or to allow the other party to make an appropriate request for additional discovery or inspection."

{¶ 80} The state ignored its continuing duty to disclose Linda Williams's address at 76 Victor Avenue from the time it learned that was her address on and after January 7, 2008. On January 11, 2008, on defendant's motion complaining that the state had addresses for its witnesses that it had failed to disclose, the trial court ordered the state to produce "a true and accurate witness list." The state likewise disobeyed that command with respect to the address of Linda Williams. As a consequence, defendant was never provided the address of Linda Williams at 76 Victor Avenue and could not go there to interview her. Defendant's only opportunity to interview Linda Williams was prior to her testimony on January 31, 2008, in Donald Otto's office, for what Otto described as "several minutes."

{¶ 81} The state offers no reason for its failure or refusal to disclose the address for Linda Williams at 76 Victor Avenue it obtained from jail records and subsequently confirmed on January 7, 2008. Neither does the state explain why it failed to obtain Williams's address from jail records earlier, instead listing her address for purposes of discovery as "c/o Det. Galbraith." No claim is made that disclosure would have put Williams at risk of harm. In that event, the state could have sought a protective order, but it did not. Instead, the state continued to secrete the information it had a duty to disclose. As a result, defendant had only a very limited opportunity to interview Williams before she testified. The

issue is whether the misconduct of the trial prosecutors deprived defendant of her right to a fair trial.

{¶ 82} The state contends that Williams's evidence presented in the second trial was not vital to the state's case, that other, circumstantial evidence was sufficient for the conviction the state obtained. Whether that evidence was enough to convict is not determinative of defendant's claim that she was denied her right of confrontation, depriving defendant of her right to a fair trial. Williams was the only witness whose evidence demonstrated conduct on the part of defendant that resulted in her baby's death. Further, that evidence, in the form of an admission that the child "fit right in" the microwave, portrays defendant as so callous and uncaring that she is capable of murdering her own infant child in that horrible way. Williams was a crucial prosecution witness for the state in the trial proceedings that led to defendant's conviction.

{¶ 83} Discovery aids trial preparation, including the preparation of an effective cross-examination of adverse witnesses essential to a fair trial. The failure of the trial prosecutors to discharge their duty to provide timely discovery of the address of Linda Williams that was known to them for at least several weeks prior to the first trial was misconduct. The very limited opportunity that the trial prosecutors instead afforded defendant's counsel to interview Linda Williams for a few minutes shortly before her trial testimony denied defendant an adequate opportunity to prepare for her cross-examination of Williams. As a result, defendant was denied the right of prior confrontation required by *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, and Evid.R. 804(B)(1) when former testimony of a hearsay declarant is admitted in evidence. Therefore, the court sitting in the second trial denied defendant her right to a fair trial when the court permitted the state to introduce in evidence Williams's testimony from the first trial.

### B. *Kyra Woods*

{¶ 84} After Linda Williams's former testimony was offered in evidence by the state in the second trial, defendant moved to be allowed to offer the evidence of a recently discovered witness, Kyra Woods, to impeach Williams, pursuant to Evid.R. 806. That rule authorizes admission of evidence attacking or supporting the credibility of a hearsay declarant and provides:

{¶ 85} "(A) When a hearsay statement, or a statement defined in Evid.R. 801(D)(2), (c), (d), or (e), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence that would be admissible for those purposes if declarant had testified as a witness.

{¶ 86} "(B) Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain."

{¶ 87} The state objected to Woods's testimony, and after hearing arguments raising a number of issues related to the rule against hearsay, Evid.R. 801, and several of the Evid.R. 803 and 804 exceptions, the court ruled that Woods would "not (be) allowed to testify under the Ohio Rules of Evidence," subject to an "additional or more thorough proffer" by defendant of Kyra Woods's expected testimony.

{¶ 88} Kyra Woods testified by proffer. Woods stated that she and Linda Williams shared a jail cell for about three days in March 2007, after Williams had left the cell she shared with defendant. Woods said that Williams was angry with defendant for failing to return Williams's sexual favors. Woods also said that Williams was concerned about the prison time she faced and "said she was going to kite a detective about the—whatever China had told her or whatever to see if she could get some charges tooken (sic) off."

{¶ 89} Woods was asked what Williams told Woods concerning defendant's conversation with Williams. Woods replied: "She just said that China was just like—she didn't know what had happened. * * * She (defendant) was just like, I don't know what happened; I just blanked out. And she (defendant) just kept shrugging her shoulders." When asked whether Williams "ever mention(ed) anything that China had said that she put the baby in the microwave," Woods replied: "No."

{¶ 90} After hearing Woods's proffered testimony, the trial court sustained the state's objection to its admission "for reasons that include that her testimony would be cumulative to the testimony already in the record, that her testimony regarding comments made by Miss Williams to her are not inconsistent with the statements that Miss Williams testified to on the record, and that there's no evidence connecting the statements made by Miss Williams to Miss Wood in a temporal sense such that it would fall under [Evid.R.] 803.3.

{¶ 91} "So, for those reasons, the Court would exclude the testimony of Miss Wood."

{¶ 92} Evid.R. 803(3) creates an exception to Evid.R. 802 with respect to a statement of the declarant's then existing state of mind, emotion, sensation, or physical condition. The statements Linda Williams allegedly made to Kyra Woods are none of those.

{¶ 93} The court's finding that Kyra Woods's testimony would be cumulative appears to relate to testimony by Detective Galbraith, who said that Williams had

likewise not told him of defendant's admissions that she had put had the baby in the microwave. Evid.R. 403(B) authorizes the court, in its discretion, to exclude relevant evidence "if its probative value is substantially outweighed by considerations of undue delay or needless presentation of cumulative evidence."

{¶ 94} Cumulative evidence is evidence offered by multiple witnesses to prove the same fact. That Williams had made similar statements to Detective Galbraith is not probative of the fact that she separately made them to Kyra Woods. Kyra Woods's evidence would therefore not be cumulative to the testimony of Detective Galbraith. Neither would it be cumulative to Williams's own testimony, which included nothing about what she had told Woods. The probative value of Woods's evidence was not substantially outweighed by the facts overlapping other evidence that her testimony involved.

{¶ 95} Evid.R. 806 provides that a party may attack or support the credibility of a hearsay declarant by any evidence that would be admissible if the declarant had testified in court. The most frequently encountered practical effect of the rule is to permit a hearsay declarant to be impeached by inconsistent statements. Weissenberger, Section 806.1. "The purpose of impeachment by self-contradiction is to demonstrate that the witness is the type of person who either makes conflicting statements regarding the same set of facts or acts in a manner that is inconsistent with statements he or she has made. The suggestion to the trier of fact is that the inconsistency of the witness's statements or conduct demonstrated that the witness is untrustworthy because of intentional false statement or because of a defect in memory." Id., Section 613.1.

{¶ 96} Linda Williams testified that when she spoke with Detective Galbraith in March 2007, she made no mention of defendant's admissions, revealing them only much later, in January 2008. Williams said that she told Galbraith that defendant said she didn't know what had happened to her child, and that she, Williams, told police that defendant had said nothing else.

{¶ 97} The gist of Linda Williams's trial testimony concerning defendant's admissions is inconsistent with what she earlier told Detective Galbraith and, according to her proffer, Kyra Woods. In her testimony, Williams conceded that her earlier statements were untrue. It appears that based on Williams's admitted inconsistency, Woods's evidence would not be probative of Williams's lack of credibility. But that assumes that the version of events that Williams related in her trial testimony is true and that her prior statements were untrue. Defendant was entitled to introduce the evidence of Kyra Woods to argue that William's trial testimony was instead untrue, and for that reason, Williams's testimony lacks credibility. The trial court abused its discretion when it sustained the state's objection to defendant's request to call Kyra Woods.

{¶ 98} For the forgoing reasons, the third and fourth assignments of error are sustained in the respects concerned.

{¶ 99} Defendant further argues, under the third assignment of error, that the trial court erred when it denied defendant's motion for a new trial based on the recanted testimony of Linda Williams. We rejected that contention when we overruled the second assignment of error.

{¶ 100} Under her fourth assignment of error, defendant argues further prosecutorial misconduct in failing to disclose exculpatory evidence, but does not identify what that exculpatory evidence was. Defendant also argues that the state failed to advise the defendant of the state's expenditures on behalf of Linda Williams and failed to make diligent efforts to procure the presence of Linda Williams at trial. Defendant also complains, again, of discovery failures. These matters were either addressed under the prior assignments of error or are rendered moot by our determination of them.

## FIFTH ASSIGNMENT OF ERROR

{¶ 101} "Even if the four previous assignments of error when considered individually do not mandate reversal, the cumulative effect of those errors should cause this court to reverse the convictions."

{¶ 102} The error assigned is rendered moot by our decision sustaining the third and fourth assignments of error in part. We exercise our discretion pursuant to App.R. 12(C)(3) and decline to decide the error assigned.

## Conclusion

{¶ 103} Having sustained the third and fourth assignments of error in part, we reverse defendant's conviction, and we remand the case for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

Brogan and Fain, JJ., concur.