[Cite as *State v. Wilson*, 2012-Ohio-3098.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                  :

    Plaintiff-Appellee                    :                    C.A. CASE NO.    24577

v.                                             :                    T.C. NO.    10CR1612

DEREK L. WILSON                                :                    (Criminal appeal from
                                                                   Common Pleas Court)

    Defendant-Appellant                   :

                                               :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the _____6th_____ day of _____July_____, 2012.

· · · · · · · · · ·

R. LYNN NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

DANIEL R. ALLNUTT, Atty. Reg. No. 0085452, 614 East Second Street, Franklin, Ohio 45005
    Attorney for Defendant-Appellant

· · · · · · · · · ·

FROELICH, J.

    **{¶ 1}** Derek Lamont Wilson was convicted after a jury trial of murder, felonious

assault, and tampering with evidence. The murder and felonious assault counts were merged for sentencing, and the court imposed 15 years to life for the murder. The court sentenced Wilson to an additional three years for tampering with evidence, to be served consecutively to his murder sentence.

{¶ 2}    Wilson appeals from his conviction, raising eight assignments of error. We will address them in an order that facilitates our analysis. For the following reasons, Wilson's conviction will be affirmed.

## I.   Speedy Trial

{¶ 3}    In his second assignment of error, Wilson claims that the State violated his constitutional and statutory right to a speedy trial when his trial began more than 90 days after his waiver of extradition from Michigan to Ohio.

{¶ 4}    The right to a speedy trial is guaranteed by the United States and Ohio Constitutions. *State v. Adams*, 43 Ohio St.3d 67, 68, 538 N.E.2d 1025 (1989). Ohio's speedy trial statute, R.C. 2945.71, "was implemented to incorporate the constitutional protection of the right to a speedy trial" provided in the United States and Ohio Constitutions. *Brecksville v. Cook*, 75 Ohio St.3d 53, 55, 661 N.E.2d 706 (1996). As such, that statute must be strictly construed against the State. *Id.*

{¶ 5}    A defendant can establish a prima facie case for a speedy trial violation by demonstrating that the trial was held past the time limit set by statute for the crime with which the defendant is charged. *State v. Gray*, 2d Dist. Montgomery No. 20980, 2007-Ohio-4549, ¶ 15. "If the defendant can make this showing, the burden shifts to the State to establish that some exception[s] applied to toll the time and to make the trial timely.

If the State does not meet its burden, the defendant must be discharged. R.C. 2945.73."

*Id.*

{¶ 6}     Under R.C. 2945.71(C)(2), the State must bring a felony defendant to trial within 270 days of arrest. "Each day during which the accused is held in jail in lieu of bail on the pending charge is counted as three, pursuant to the triple-count provision of R.C. 2945.71(E). This 'triple-count' provision would reduce to 90 days the time for bringing to trial an accused who is incarcerated the entire time preceding trial." (Citation omitted.) *State v. Dankworth*, 172 Ohio App.3d 159, 2007-Ohio-2588, 873 N.E.2d 902, ¶ 31 (2d Dist.).

{¶ 7}     The time within which a defendant must be brought to trial may be extended only for the reasons specifically enumerated in R.C. 2945.72. *State v. Brewer*, 2d Dist. Montgomery Nos. 22159, 22160, 2008-Ohio-2715, ¶ 37, citing *State v. Palmer*, 84 Ohio St.3d 103, 1998-Ohio-507, 702 N.E.2d 72. Permissible reasons for extending the trial date include:

(A) Any period during which the accused is unavailable for hearing or

trial, by reason of other criminal proceedings against him, within or outside

the state, by reason of his confinement in another state, or by reason of the

pendency of extradition proceedings, provided that the prosecution exercises

reasonable diligence to secure his availability; [and]

* * *

(H) The period of any continuance granted on the accused's own

motion, and the period of any reasonable continuance granted other than upon

the accused's own motion[.]

R.C. 2945.72.

{¶ 8}    In this case, the relevant course of events is as follows:

Jan. 24, 2009  Wilson was arrested

Jan. 26. 2009  Wilson was released from jail without formal charges being filed; soon thereafter, Wilson moved to Grand Rapids, MI

Oct. 13, 2010  Wilson was indicted on the instant charges and a warrant was issued for his arrest

Nov. 24, 2010 Wilson waived extradition following his arrest in Michigan

Dec. 7, 2010          Wilson was transported to the Montgomery County Jail in Ohio and re-arrested

Dec. 27, 2010[1] Wilson moved for a continuance of the scheduling conference; the following day, the trial court re-set the scheduling conference for January 10, 2011

Mar. 14, 2011          Wilson's trial began

{¶ 9}    On the morning of March 14, 2011, defense counsel moved for dismissal of the charges on the ground that Wilson's speedy trial rights had been violated.  Counsel's primary contention was that Wilson's post-indictment speedy trial time began to run on November 24, 2010, the day that he waived extradition.  Excluding the time between December 27, 2010 and January 10, 2011, Wilson argued that he was in jail for 99 days,

_____

[1]In chambers before the trial, Wilson's counsel stated that he moved for a continuance on December 27, 2010, the day of the ordered scheduling conference.   No oral motion is reflected in the record, but a written motion was submitted on December 28, 2010.

which exceeded the 90-day limit under the speedy trial statute. The State responded the time period did not begin to run again until December 7, 2010, when Wilson was returned to Ohio, and that the State had until March 17, 2010, to bring Wilson to trial. The trial court overruled Wilson's motion.

{¶ 10} If the period between Wilson's waiver of extradition and his return to Ohio were not counted against the State, Wilson's trial on March 14, 2011 would be timely. Two days were charged against the State for the days in January 2009 that Wilson was in jail. (The date of Wilson's arrest is not counted as part of the speedy trial time. *E.g.*, *State v. Stewart*, 2d Dist. Montgomery No. 21462, 2006-Ohio-4164, ¶ 16.) Another 20 days elapsed from December 8 (the day following his re-arrest in Ohio) until December 27, when Wilson filed his motion for a continuance. Wilson agreed at the time of his motion to dismiss that the period between December 27 and January 10, 2011, did not count against the State. The time began again on January 10, 2011 and continued until March 14, 2011, which amounted to 64 days. Thus, 86 days were charged against the State for speedy trial purposes.

{¶ 11} We agree with the State that Wilson's post-indictment speedy trial time did not begin to run until he was returned to Ohio. R.C. 2945.72(A) tolls the speedy trial time during any period when a defendant is confined in another state, provided the State exercises reasonable diligence to secure his availability. "It does not appear that the statutory requirement of 'reasonable diligence' imposes a particularly exacting duty, and what constitutes the exercise of reasonable diligence, therefore, might vary substantially from case to case." *State v. Bates*, 2d Dist. Montgomery No. 18414, 2001 WL 173188, *1 (Feb. 23, 2001). Wilson waived extradition from Michigan on November 24, 2010, and he was

transported to Ohio thirteen days later. Wilson has not articulated why this 13-day delay (which included time over the Thanksgiving holiday) constituted a lack of reasonable diligence, and it is not apparent that the State unreasonably extended Wilson's confinement in Michigan due to a failure of due diligence.

{¶ 12}  Wilson's second assignment of error is overruled.

## II.  Sufficiency and Manifest Weight of the Evidence

{¶ 13}  In his fifth assignment of error, Wilson claims that his convictions were based on insufficient evidence and were against the manifest weight of the evidence. Wilson argues that the State presented unreliable witness testimony and forensic evidence, that a detective's testimony regarding Wilson's statement to the police was unreliable, and that the manifest weight of the evidence supported his version of events.

{¶ 14}  An argument based on the sufficiency of the evidence challenges whether the State presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1999). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 15}  In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581,

2009-Ohio-525, ¶ 12. When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 44.

**{¶ 16}** Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.*

**{¶ 17}** The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**{¶ 18}** The evidence, when construed in the light most favorable to the State, established the following facts:

**{¶ 19}** Leanet McGee lived with Wilson, her boyfriend, in a two-story duplex at 2618 North Main Street in Dayton. On the morning of January 23, 2009, McGee took a cab to work at Stillwater Center. McGee worked both the first shift from 6:00 a.m. to 2:00 p.m.

and the second shift from 2:00 p.m. to 10:00 p.m. During the second shift, she made arrangements to socialize after work with two co-workers, Livette Williams and Ruth Smith, at Doc's Tavern on North Main Street.

{¶ 20} Williams drove McGee to Doc's Tavern, and they arrived shortly after 10:00 p.m.; Smith met them there. The women socialized and had about two drinks. While there, McGee spoke briefly at the bar area with Thuron Durden, whom she knew from high school. Between 11:45 p.m. and midnight, the three women left. Williams dropped McGee off in the alley behind McGee's home. She saw McGee go to the back door and look for her keys. Williams testified that she saw Wilson open the back door; McGee turned and waved to her, and then went inside her home.

{¶ 21} Durden testified that, after completing work at 11:00 p.m., he went to Doc's Tavern with his co-worker, Ellen Candler, and Candler's sister. When McGee's group left Doc's Tavern shortly before midnight, Durden and his friends sat in their booth. Soon thereafter, McGee came back alone and sat down with them. Doc's Tavern closed around 12:30 a.m., and the group decided to go to Northtown Bar. McGee asked to ride with Durden, because she had walked to Doc's Tavern; Candler and her sister drove in Candler's car. When Northtown Bar closed around 2:00 a.m., Durden drove McGee home; Candler and her sister followed them. Before getting out of the car, McGee exchanged phone numbers with Durden by calling his cell phone from her cell phone. McGee's cell phone records confirmed that Durden's cell phone number called McGee's cell phone number at 2:22 a.m. on January 24, 2009. McGee's cell phone records further indicated that, one minute before, McGee had received a 10-second phone call from the pay phone at Parkwood

and Main, which Wilson often used to call McGee. (The pay phone records also indicate that such a call was made to McGee's phone.) McGee checked her voice mail, which required her to enter a password, at 2:24 a.m.

{¶ 22} McGee stumbled as she tried to walk to the front door of her house. Durden and Candler, who were watching from their cars, both believed that McGee was intoxicated. Durden got out and helped her to the front door. McGee opened the front door with her keys, and Durden went into the house with her. Durden waited in the front room of the house while McGee went to use the bathroom; Durden was focused on his phone, but the home appeared to be "in order" and he did not notice any signs of a prior struggle in the house. When McGee returned from using the bathroom, Wilson came into the front room with her and looked at Durden with "disdain." McGee introduced Durden to Wilson. Durden told Wilson that he "was just making sure she was home safely." Wilson responded, "She at home now." Durden said, "See you later," and turned to leave. Wilson followed him to the front door, stepping on Durden's heel in the process.

{¶ 23} Lois Dawson testified she had come home to 2616 North Main Street, the other half the duplex, sometime between 11:30 p.m. and shortly after midnight and decided to watch television in the front room of her house. At some point while she was sitting on the couch, she saw the motion detector light go on in the back of the duplex and heard, through the duplex wall, Wilson and McGee talking in the back kitchen area of their home. Wilson repeatedly asked, "Where you've been?" Dawson stated that the voices became raised, with Wilson again asking McGee where she had been and McGee responding that she had been out with her friend. Dawson then heard a "commotion" and "fighting." Wilson

stated, "You're lying," and Dawson heard the sound of "something hitting something" and of McGee whimpering and crying. McGee repeatedly said, "I didn't do nothing" and denied being with someone else. Dawson testified that she heard more "hitting sounds." Dawson's nephew, Windale, who was staying at her house that night, briefly awoke and also heard McGee say, "I wasn't with nobody" and "I didn't do nothing."

{¶ 24}  Dawson decided to call the police and she attempted to find a working telephone, but her home phone and her cell phone both had dead batteries. Dawson saw a car coming down the street and ran outside, but the car passed by the house. Dawson then went onto the stoop of McGee's side of the duplex and looked through the window blinds. She saw Wilson standing over and punch McGee, with McGee at his ankles. Dawson became scared, went back to her home, sat down, and began to cry. She continued to hear "the sound of pounding." After a while, Dawson no longer heard McGee's voice. Dawson testified that it got "quiet for a minute," and Wilson said, "Bitch, get your motherfucking leg off of me." It was quiet again, and then Wilson shouted, "Leanet!" Afterward, Dawson heard the sound of furniture being moved, "things just thrown around or moving around, and running and – a lot of commotion." Dawson continued to cry in her home. At some point, Dawson saw the motion detector light go on again outside, and she saw someone at the back of the house. Dawson returned to a couch and "fell asleep for a minute;" when she awoke, there were police cars in front of the house.

{¶ 25}  At approximately 4:45 a.m., the Dayton police received a 911 call from Wilson, who stated that someone had broken into his house and done something to his "wife;" he reported that he had opened the door to his home and found her "lying down."

Wilson started crying and said that he thought "they were trying to rob him." Wilson reported the address as "1628 North Main" and said that he had run to and called from a pay phone because there was no phone at the house. (Phone records for the pay phone at Parkwood and Main indicated that a 911 call was made from that phone at 4:45 a.m.)

{¶ 26} Officers were dispatched to the 1600 block of North Main Street and found nothing there. Sergeant James Mullins, who had heard the call, then proceeded to North Main and Parkwood, the location of the pay phone from which the 911 call was made. Mullins saw an individual in the middle of the street approximately one and one-half blocks away from the pay phone. The man, later identified as Wilson, flagged down the officer, pointed to his house, and said, "She's in there."

{¶ 27} Mullins went into the home and found McGee lying on her back in the middle room of the first floor. She was mostly naked; her sweater was pulled up above her breasts, her panties were by her right ankle, and she was wearing a sock on her left foot. McGee's right eye was black, bloody, and swollen shut, her left eye was bruised, and a trickle of blood ran down to the floor from her right eye area. Mullins heard Wilson say, "They were coming to rob me and they got her." Medics were unable to revive her. The coroner's office and homicide detectives were called to the scene.

{¶ 28} Dr. Kent Harshbarger of the Montgomery County Coroner's Office later determined that McGee died from complications of blunt force injuries of the head. In addition to the visible injuries, the autopsy revealed additional large contusions across McGee's forehead, temples, jaw muscles, neck, and tongue; some of the injuries were consistent with strangulation, i.e., blunt force injuries of the neck. McGee had not been

sexually assaulted.

{¶ 29} Wilson was placed in a cruiser to keep him out of the way. He gave the officer's consent to search the house for evidence. A set of keys was removed from the front door. Fingerprints were collected from several items on the first floor, and a double pair of athletic socks (socks within socks) with possible blood was taken from the laundry room. Furniture and a television set were knocked over, and the house was in disarray. The officers noticed damage to the back and side doors to the home, but McGee's landlord testified that the damage predated January 23-24, 2009.

{¶ 30} Wilson was interviewed by detectives during the morning of January 24, 2009. He initially told Detective Engle that he had last seen McGee at 2:00 a.m on January 24. After another detective came into the room, Wilson stated that he had last seen McGee at 5:30 a.m. on January 23, as she got ready for work. According to Engle, Wilson told the detectives that he left his home around 9:30 p.m. to go to the American Legion or VFW with his cousin, Clifton Brown, and when he returned home, he found McGee lying naked on the floor. Wilson stated that he had told McGee to "quit playing" and nudged her with his toe, and when she didn't respond, he pulled out his gun, searched the house, and saw drawers pulled out. Wilson told the detectives that he knew who had committed the crime and he "would take care of it." Wilson said that he owed money for drugs. Wilson told the detectives that he was in the house no more than 15 minutes before calling the police. Before the police arrived, he gave his gun to a "dope fiend," because he (Wilson) was not allowed to have one. Wilson stated that the stains on his pants were barbeque sauce. When the officers pointed out that there appeared to be blood on his leg, Wilson stated that

he nudged McGee with his leg.

{¶ 31}    Wilson was arrested following his interview with the detectives.    The officers took photos of Wilson, including a photograph of a VFW stamp on his hand, and collected Wilson's clothing and shoes.   Wilson was also wearing a chain with some boxing gloves; Wilson stated to Engle that he had once been a golden gloves boxer.   A forensic scientist from the Miami Valley Regional Crime Lab testified that McGee's blood was found on the shoes, plaid shirt and blue jeans; McGee's blood was also found on the double pair of socks found in the house.

{¶ 32}    At the conclusion of the State's case, Wilson offered the testimony of his cousin, Clifton Brown.   Brown stated that he had spoken with Wilson on January 23, 2009, and made plans for the evening.   Between 9:00 and 10:00 p.m., Brown picked up Wilson at his home, and the two drove to 8 Ball and Wings, a sports bar in Trotwood.   They stayed at the sports bar for approximately an hour.   Afterward, the men went to the Upper Krust, another bar/restaurant near the intersection of North Main Street and Santa Clara Avenue. They remained there for approximately 45 minutes to an hour.   They then went to the VFW and stayed for an hour or more.   Brown needed to be home by 2:30 a.m., and he testified that he dropped Wilson off at his home between 2:00 and 2:10 a.m.   Brown indicated that he had reached his own house by about 2:15 a.m.

{¶ 33}    Brown further testified that he and his wife received a phone call sometime between 4:30 and 5:30 a.m. on January 24 and, in response, he returned to Wilson's house. When he arrived, he saw a van and yellow police tape around the house.   Brown spoke with Sergeant White at the scene.   Later that day, Brown received a phone call from Wilson from

the Montgomery County Jail. On January 26, Brown learned that Wilson had been released, and he went to pick up Wilson from downtown Dayton. Brown suggested that Wilson go to Grand Rapids, Michigan, where more of their family resided. Within a few days, Brown bought Wilson a bus ticket and took him to the bus station.

{¶ 34} After deliberating, the jury convicted Wilson of murder, felonious assault, and tampering with evidence.

{¶ 35} The State's evidence, if believed, was sufficient to prove that Wilson committed felonious assault by inflicting serious physical harm to McGee and that McGee died as a result of the felonious assault. A reasonable jury could have believed that Wilson called McGee's cell phone from the nearby pay phone at approximately 2:21 a.m., and then viciously beat her after she came into the house a few minutes later. The deputy coroner's testimony supported the conclusion that McGee died as a result of the beating. Wilson's convictions for felonious assault and murder were based on sufficient evidence.

{¶ 36} Wilson also claims that his convictions for felonious assault and murder were against the manifest weight of the evidence. First, he argues that several witnesses provided unreliable testimony. He emphasizes that Dawson's original statement to the police did not include that she had looked through McGee's window blinds and seen Wilson standing over McGee readying to punch her. Wilson further notes that Durden did not talk to the police until September 2010, and that Dawson's nephew testified that the noise from the alleged fight did not prevent him from going back to sleep. Wilson also claims that his alleged statements to the police could not be believed, because he did not voluntarily speak with the detectives.

{¶ 37} Second, Wilson claims that the forensic evidence was unreliable, because several of the biological samples from McGee's autopsy were mislabeled with another person's name or with McGee's name misspelled. Wilson also notes that not all of the blood samples recovered from the crime scene were tested. Steven Wiechman, a serology expert at the MVRCL, and Dr. Harshbarger both testified that several samples were mislabeled.

{¶ 38} Third, Wilson argues that the evidence supports the conclusion that he came home from an evening with Brown and found McGee severely beaten on the floor of their residence. He emphasizes that the evidence technician found a crowbar and butter knife just inside the side door and that the rear door was open a couple of inches. He further points out that he had a VFW stamp on his hand, which confirmed that he and Brown had visited that establishment. During closing argument, Wilson's counsel argued that McGee died around 1:30 a.m., based on the degree of livor mortis and rigor mortis and McGee's body temperature, as recorded by the coroner's office.

{¶ 39} Upon considering all of the evidence at trial, we do not agree that Wilson's convictions for felonious assault and murder were against the manifest weight of the evidence. There was evidence of damage to the rear and side doors, but McGee's landlord testified that the damage existed prior to January 23, 2009. In addition, the evidence technician testified that he did not believe that a person could enter through the side door with the way it was propped up from the inside. As noted by Wilson, several biological samples from the autopsy were mislabeled; however, those samples were treated as "Jane Doe" samples and were confirmed to be from McGee through DNA testing.

{¶ 40} The witnesses' testimony varied to some extent and Dawson's testimony suggested that she believed that the assault on McGee occurred closer to midnight. However, the evidence strongly supported the jury's conclusion that Wilson beat McGee following her return from Northtown Bar around 2:25 a.m. Brown's testimony on Wilson's behalf, even if believed, indicated that Wilson had returned home just prior to McGee's return to their residence. Moreover, the jury did not lose its way in accepting Wiechman's testimony that McGee's blood was found on Wilson's clothing. As stated above, the credibility of the witnesses and the weight to be given to their testimony were matters for the jury, as the trier of fact, to determine. The jury's decision to credit the State's evidence did not create a manifest injustice, and Wilson's convictions for felonious assault and murder were not against the manifest weight of the evidence.

{¶ 41} The tampering with evidence charge presents a closer question. R.C. 2921.12(A)(1) provides that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." During closing argument, the State argued that Wilson committed tampering with evidence when he "completely changed the crime scene. He knocked items over, he flipped tables over, staged her body. And he did all of that to throw off the police, to make it look like he didn't commit the crime."

{¶ 42} At trial, the State presented evidence that the front and middle rooms of the first floor were in disarray. Some of the couch cushions in the front room were on the floor,

the coffee table had been moved, and the television was pushed over; figurines were on the floor. In the middle room, where McGee was found, chairs and tables were pushed over, and a vase, some flowers, and various other items were on the floor. Upstairs, in the master bedroom, the dresser drawers were pulled out, the television had been moved, a DVD player was hanging by a wire, and CDs were scattered on the floor; it did not appear that anything had been pulled out of the dresser drawers. Dawson testified that after she no longer heard McGee and heard Wilson shout McGee's name, she heard the sound of furniture being moved, "things just thrown around or moving around, and running and – a lot of commotion." Finally, McGee was found nearly naked, wearing one sock, her panties by her ankle, and her sweater pulled up, yet there was no sign of a sexual assault. Wilson called the police, and repeatedly told officers that someone had broken into his home to rob him.

{¶ 43} Construing the evidence in the light most favorable to the State, a reasonable jury could have concluded that Wilson ransacked the front and middle rooms of the house and rearranged items in the master bedroom so that it would appear that someone had broken into the house and searched it. In addition, the jury could have concluded from Dawson's auditory account of the events, combined with McGee's appearance on the floor, that Wilson undressed McGee so that it would appear she had been sexually assaulted. Although there was no direct evidence of what Wilson did inside the home, we cannot say that the jury's conclusion to convict Wilson of tampering with evidence was unreasonable or against the manifest weight of the evidence.

{¶ 44} Wilson's fifth assignment of error is overruled.

### III. Court's Witness

{¶ 45}     In his first assignment of error, Wilson claims that the trial court "abuse[d]

its discretion when it prematurely sustained a Motion in Limine, improperly ruled against

calling a 'Court's Witness,' failed to collect sufficient facts to make such a determination,

and overruled the Appellant's Motion for a Continuance."

{¶ 46}     Before the beginning of the second day of trial (after jury selection, but

before opening statements), the State filed a motion in limine to prevent defense counsel

from introducing the prior statements of Shawn Casey, a potential defense witness, through

Moses Kuhbander, another potential defense witness.   While discussing that motion in

chambers, the prosecutors informed the court that Kuhbander had sent an affidavit to defense

counsel, which indicated that Casey had admitted to Kuhbander in jail that he (Casey) had

beaten and murdered McGee.   The State had also received a letter from Kuhbander

containing the same allegation.   (In his letter to the prosecutor, Kuhbander also asked for a

deal in exchange for his information.)   The prosecutor indicated that the police subsequently

talked with Casey, who denied any involvement in the crimes.   The State informed the court

that it anticipated that Wilson would call Casey at trial and would request that the court call

him as a court's witness, pursuant to Evid.R. 614.   The State asked the court to deny any

request to treat Casey as a court's witness and to prevent defense counsel from mentioning

Casey's alleged confession to Kuhbander during opening statements.

{¶ 47}     After an extensive discussion, the court ruled that it would deny an Evid.R.

614 motion to call Casey as a court's witness.   The court further agreed with the State that

defense counsel should not mention Kuhbander during his opening statement; counsel could

still mention Casey.   Following the court's ruling, defense counsel asked for a continuance

to "rework my opening." Defense counsel indicated that the ruling precluded him "from doing half of an opening." The court overruled the request for a continuance, saying, "I cannot say you get a continuance because you now have to take out something that was – you could have reasonably foreseen would not be admissible anyway. * * * I think there has to be some strong grounds for a continuance * * *."

{¶ 48} A ruling on a motion in limine reflects the court's "anticipatory treatment of the evidentiary issue. In virtually all circumstances finality does not attach when the motion is granted. Therefore, should circumstances subsequently develop at trial, the trial court is certainly at liberty 'to consider the admissibility of the disputed evidence in its actual context.'" *State v. Grubb*, 28 Ohio St.3d 199, 201-202, 503 N.E.2d 142 (1986), quoting *State v. White*, 6 Ohio App.3d 1, 4 , 451 N.E.2d 533 (8th Dist.1982). For those reasons, a motion in limine generally does not preserve for purposes of appeal any error in the disposition of the motion in limine. The failure to object at trial to the exclusion of evidence constitutes a waiver of the challenge. *State v. Davis*, 2d Dist. Montgomery No. 20709, 2005-Ohio-5783, ¶ 27.

{¶ 49} The State's motion in limine was directed to an anticipated request by Wilson to call Casey as a court's witness. Evid.R. 614(A) provides that "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." The rule "authorizes the court to call a witness whom a party might otherwise call, on the party's 'suggestion' that the witness would then recant another, prior statement favorable to that party." (Internal quotations and citation omitted.) *State v. Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218, ¶ 43

(2d Dist.), citing *State v. Kiser*, 6th Dist. Sandusky No. S-03-028, 2005-Ohio-2491. "When the court calls a witness on its own motion, a party need not satisfy the surprise and affirmative-damage requirements of Evid.R. 607(A) in order to impeach the witness." *Arnold* at ¶ 44, citing *State v. Apanaovich*, 33 Ohio St.3d 19, 514 N.E.2d 394 (1987).

**{¶ 50}** The purpose of calling a witness as a court's witness is to allow for a proper determination in a case where a witness is reluctant or unwilling to testify. *State v. Curry*, 8th Dist. Cuyahoga No. 89075, 2007-Ohio-5721, ¶ 18. "A witness whose appearance is important to the proper determination of the case, but who appears to be favorable to the other party, is a principal candidate for application of Evid.R. 614(A)." *Id.,* citing *State v. Brewer*, 10th Dist. Franklin No. 84AP-854, 1986 WL 2652, *3 (Feb. 25, 1986). The prime candidate is a victim and an eyewitness who will not otherwise cooperate with the party originally planning to call him. *Id.*

**{¶ 51}** Defense counsel did not mention Casey or Kuhbander during his opening statement. Although he asked Detective Engle a couple of questions regarding phone calls between Casey and McGee's phone, no other mention was made of Casey at trial. He was not called as a witness and his testimony was not proffered. Because Wilson failed to renew his request to call Casey as a court's witness and failed to proffer his testimony at trial, we cannot find that Wilson was prejudiced by the trial court's preliminary ruling, without a hearing, regarding Casey.

**{¶ 52}** Wilson further argues that the trial court erred in denying his motion for a continuance. The grant or denial of a continuance is a matter entrusted to the broad, sound discretion of the trial judge, which will not be reversed absent an abuse of discretion. *State*

*v. Unger*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981). An abuse of discretion requires a finding that the decision was unreasonable, arbitrary, or unconscionable. *State v. Anderson*, 2d Dist. Montgomery No. 24657, 2012-Ohio-957, ¶ 6.

**{¶ 53}** "In determining whether a trial court abused its discretion when ruling on a motion for a continuance, a reviewing court must weigh any potential prejudice to the defendant against the trial court's 'right to control its own docket and the public's interest in the prompt and efficient dispatch of justice.'" *State v. Pattson*, 2d Dist. Montgomery No. 23785, 2010-Ohio-5755, ¶ 19, quoting *Unger*. The trial court should consider such factors as: (1) the length of the delay requested; (2) whether other continuances have been requested and received; (3) the inconvenience to litigants, witnesses, opposing counsel and the court; (4) whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; (5) whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and (6) any other relevant factors, depending on the unique facts of the case. *Unger* at 67-68.

**{¶ 54}** Here, defense counsel requested a continuance immediately prior to opening statements so that he could "rework" his opening. He did not request a particular period of time. Although there is no suggestion that defense counsel requested the delay for any improper purpose, it was reasonable for the court to require the trial to continue without delay. Trial counsel could have reasonably anticipated that Kuhbander's statements might not be admitted at trial. And if defense counsel believed that a substantial reworking of his opening statement was required, he could have opted to give his opening statement after the State rested, as the trial court indicated he could do. Finally, we find no evidence that

Wilson was prejudiced by the denial of the continuance; defense counsel gave a lengthy, clear statement of the facts that he anticipated would be presented at trial, with an emphasis on Wilson's alibi defense.

{¶ 55} The first assignment of error is overruled.

### IV. Ineffective Assistance of Counsel

{¶ 56} In his third assignment of error, Wilson claims that his trial counsel provided ineffective assistance by (1) failing to file a motion to suppress and (2) failing to call Casey as a witness and to attempt to call Kuhbander as a witness.

{¶ 57} We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.* Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992).

{¶ 58} First, Wilson claims that his trial counsel should have moved to suppress

the statements that he gave to Detective Engle on the morning following the murder. Wilson notes that he did not sign a written *Miranda* waiver, and he argues that a suppression hearing "could have evaluated whether the Appellant had voluntarily waived his rights."

{¶ 59} The "failure to file a suppression motion does not constitute per se ineffective assistance of counsel." *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Rather, trial counsel's failure to file a motion to suppress constitutes ineffective assistance of counsel only if the failure to file the motion caused the defendant prejudice; that is, when there is a reasonable probability that, had the motion to suppress been filed, it would have been granted. *State v. Howard*, 2d Dist. Montgomery No. 23795, 2011-Ohio-27, ¶ 22, citing *State v. Wilson*, 2d Dist. Clark No. 08 CA 445, 2009-Ohio-2744, ¶ 11.

{¶ 60} According to Sergeant Mullins, Wilson was placed in a police cruiser at the scene "to keep him out of our [and the medics'] way" and to "secure the scene." Wilson was not handcuffed when he was placed in the cruiser, and Mullins stated that he was not under arrest.

{¶ 61} Detective Engle testified at trial that Wilson was seated, without handcuffs, in the back of a cruiser when he (Engle) arrived at 2618 North Main Street at 5:45 a.m. He obtained Wilson's consent to search the house, and around 6:20 a.m., Engle asked for Wilson to be transported to the Dayton police station for an interview.

{¶ 62} Detective Engle began the interview at approximately 7:25 a.m. Wilson was seated in a small interview room; he was not handcuffed. Wilson was coherent and

talkative, and Engle saw no signs that Wilson was under the influence of drugs or alcohol. Engle asked Wilson some personal information, such as his name, address, birthdate, and height and weight. Engle asked about the pendant around Wilson's neck and the last time he saw McGee. After Wilson answered, Engle left the room and got Detective Olinger, so that they could both hear about his last contacts with McGee. During the course of the interview, the detectives took photos of Wilson's clothing.

{¶ 63} After observing what appeared to be blood, the detectives decided to advise Wilson of his *Miranda* rights using a waiver of rights form. Wilson indicated that he understood his rights, but he was not willing to sign the form. Engle testified that Wilson said that "[h]e'd tell us what we wanted to know, but he did not want to sign anything." The detectives had Wilson "start over" and tell them what had occurred. Wilson again described what happened. Afterward, the detectives gave him some water and left the room. When they returned, Detective Engle accused Wilson of the crime to "see what his reaction was." Wilson became angry and decided not to talk anymore. Wilson was then arrested.

{¶ 64} In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that the State may not use statements stemming from a defendant's custodial interrogation unless it demonstrates the use of procedural safeguards to secure the defendant's privilege against self-incrimination. *Id.* at 444. Police are not required to give *Miranda* warnings to every person that they question, even if the person being questioned is a suspect. *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997). Instead, *Miranda* warnings are only required for custodial interrogations. *Id.*

{¶ 65}　"Custodial interrogation" means questioning initiated by the police after the person has been taken into custody or otherwise deprived of his freedom in any significant way. *State v. Wilson*, 2d Dist. Montgomery No. 22665, 2009-Ohio-1279, ¶ 18, citing *State v. Steers*, 2d Dist. Greene No. 89-CA-38, 1991 WL 82974 (May 14, 1991). In order for a defendant's statements made during a custodial interrogation to be admissible, the State must establish that the accused knowingly, voluntarily, and intelligently waived his or her rights. *Miranda*, supra; *State v. Edwards*, 49 Ohio St.2d 31, 38, 358 N.E.2d 1051 (1976), overruled on other grounds, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

{¶ 66}　Based on the record before us, we see no indication that Wilson's *Miranda* rights were violated. Sergeant Mullins testified that Wilson was placed in the police cruiser at the scene merely to preserve the crime scene and to prevent Wilson from interfering with the officers' and the paramedics' duties. He was not handcuffed at his home, and there is no evidence that the officers engaged in any behavior that would have led Wilson to believe that he was under arrest at the scene.

{¶ 67}　Wilson was transported to the police station by the police and placed in a small interview room; Wilson was not handcuffed during his statements. Although a suppression hearing might have fleshed out whether Wilson went to the police station voluntarily, the record before us provides no basis for us to conclude that Wilson was in custody when he was taken to the station. Once Wilson was informed of his *Miranda* rights, he orally expressed that he understood them and was willing to continue to talk with the detectives. Indeed, Engle described Wilson as "talkative" during the interview. The fact that Wilson did not want to sign the waiver of rights form did not render his waiver

invalid.

{¶ 68}    In short, a motion to suppress Wilson's statement might have led to evidence that Wilson was, in fact, in custody prior to his arrest at the conclusion of the interview and that he did not validly waive his *Miranda* rights.  However, based on the testimony provided at trial, we see no indication that Wilson's motion to suppress would have been granted had one been filed.  Accordingly, Wilson has not established that his trial counsel was ineffective in failing to submit a motion to suppress his statements.

{¶ 69}    Second, Wilson claims that his trial counsel acted deficiently when he failed to call Casey and, if necessary, Kuhbander, as witnesses at trial.  Wilson argues: "This decision is not merely trial strategy.  If he admitted to the murder, then the Appellant would have arguably been acquitted on the murder charge.  If he denied committing the murder, then trial counsel could have at least attempted to call Mr. Kuhbander. * * * There was no strategic reason not to call Mr. Casey when the potential benefit was so great."

{¶ 70}    Although counsel discussed Casey's and Kuhbander's statements prior to opening statements, defense counsel did not proffer Casey's testimony during the trial.  And because Casey was not called, we can only speculate as to his testimony.  Given that counsel expected Casey to deny any involvement with McGee's murder, Wilson has not established that counsel's failure to call him as a witness at trial affected the outcome of his trial.  Moreover, Wilson has not demonstrated that Kuhbander would have been permitted to testify to Casey's alleged jailhouse confession, *see* Evid.R. 607(A) and Evid.R. 804(B)(3), or that he would have testified similarly to his affidavit if called as a witness.  Based on the record, we cannot conclude that defense counsel acted unreasonably in failing to call Casey

and Kuhbander or that his failure to do so prejudiced Wilson.

{¶ 71}  The third assignment of error is overruled.

## V.  Evidentiary Rulings

{¶ 72}  In his fourth assignment of error, Wilson claims that the trial court "mistakenly ruled on a number of critical matters of evidence."

{¶ 73}  Relevant evidence is generally admissible whereas irrelevant evidence is not.  Evid.R. 402.  "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Evid.R. 401.  Relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.  Evid.R. 402; Evid.R. 403(A).  Decisions regarding the admissibility of evidence at trial are within the broad discretion of the trial court and will be upheld absent an abuse of discretion and material prejudice.  *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 86; *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, ¶ 50.

{¶ 74}  First, Wilson complains that the trial court, over defense counsel's objection, permitted the State to elicit testimony from Detective Engle that Wilson had been incarcerated and then allowed the State to play a recorded telephone call that Wilson made to Brown from jail on January 24, 2009.  Specifically, the defense objected "because we're not supposed to be talking about whether he's incarcerated or not.  They're going to be talking about this phone call."  There was no objection to any other content of the recording.

{¶ 75}  Wilson's statements during the telephone conversation were admissible as

an admission of a party-opponent, pursuant to Evid.R. 801(D)(2). The court did not err in permitting the phone call to be played. Moreover, the court did not act unreasonably when it permitted the State to elicit foundational testimony that Wilson's call was placed from jail following his arrest. The telephone call was made on the same day as his arrest; the jury was told of this fact and that Wilson was released after two days. Accordingly, we do not find that the prejudicial effect of Engle's testimony outweighed its probative value.

{¶ 76} Later, in the State's rebuttal closing argument, the prosecutor argued, without objection, that during the recorded telephone conversation from the jail, Wilson would not explain to his cousin what had happened. Specifically, when Brown asked Wilson what had happened, Wilson had responded, "I can't talk to you. I can't talk to you on the phone about it." The prosecutor emphasized that Wilson had just spoken with the detectives, and "if he's got something to say, if he's got the truth to say, if he was telling the truth to the detectives, wouldn't you think he'd be repeating that same story?" Although not raised as an assignment of error in his brief, Wilson suggested at oral argument that this was an improper comment in violation of his right to remain silent. *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

{¶ 77} The Fifth Amendment to the United States Constitution protects against compelled self-incrimination, *e.g.*, *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 190, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004), and the case law is replete with factual scenarios parsing whether pre-arrest and post-arrest silence constitutes a proper subject for comment by the State. An appellate court reviews the trial court's treatment of a prosecutor's comment on silence under a harmless error standard. *State v. Forbus*, 2d Dist.

Montgomery No. 24061, 2011-Ohio-4287, ¶ 20, citing *State v. Thompson*, 33 Ohio St.3d 1, 4, 514 N.E.2d 407 (1987).

{¶ 78} Wilson's statement – or lack of a statement – to Brown was not directed to law enforcement personnel, but it was in a conversation which he knew was being recorded by law enforcement. Even assuming that the conversation involved Wilson's right to remain silent, Brown, a defense witness, testified on direct examination that he had spoken with Wilson during a telephone call from the jail. Defense counsel specifically asked Brown what Wilson had said to him during that conversation:

Q   He described to you what had happen – or he described to you what he

was arrested for?

A Yes.

Q And there was no other information given to you at that time?

A No.

The prosecutor, on cross-examination, asked Brown, without objection:

Q  * * * And is it your testimony that he called you from jail and thereafter

never discussed what happened that night?

A  Correct.

Q  Never?

A  Correct.

{¶ 79} Upon review of the entirety of the record, we cannot conclude that the prosecutor's comment during rebuttal closing argument was unduly prejudicial to Wilson. The prosecutor's comment about Wilson's unwillingness to talk about the crime over the jail

telephone was a small portion of the prosecutor's lengthy rebuttal argument. The prosecutor discussed several ways – in addition to Wilson's unwillingness to talk over the jail phone – in which Wilson's behavior was indicative of guilt, including that, after getting out of jail, Wilson left Dayton for Grand Rapids, which was also inconsistent with Wilson's statement to the detectives that he knew who had committed the murder and that he would take care of it. And at the behest of the defense, Brown had also testified that Wilson did not provide any information, other than what he had been arrested for, over the jail telephone. As detailed above, there was substantial evidence from which the jury could have found that Wilson committed the offenses of felonious assault and murder. In short, even if the prosecutor's comments were improper, they were harmless beyond a reasonable doubt.

{¶ 80} Second, Wilson argues that the trial court abused its discretion when it sustained the State's objections to Wilson's questions to Detective Engle regarding the time line of the murder. Wilson argues that his trial counsel should have been able to show inconsistencies between the detective's time line and the "expert pathologist's time line."

{¶ 81} During cross-examination, Wilson's counsel asked Detective Engle if he had created a time line of the case. After Engle responded affirmatively, counsel attempted to ask about the details of the time line. The prosecutor objected and the following discussion occurred.

[PROSECUTOR]: Anything the Detective can testify as to timeline for the most part, unless he has a phone records, it's all hearsay. It's from talking to witnesses and he couldn't – he wants to get in information from discussions

with witnesses as to what time they were with the decedent and then use that.

And to establish the timeline, you need the witnesses themselves. Any understanding that he has, any timeline that he's developed, is based on interview of witnesses.

[DEFENSE COUNSEL]: Well, he's a detective, he does investigation. He can create his own timeline based on whatever information he has.

[PROSECUTOR]: But it's based on hearsay.

[DEFENSE COUNSEL]: He can make a determination of what he thinks is appropriate.

* * *

THE COURT: Sustain the objection.

{¶ 82} The trial court could have reasonably concluded that any time line developed by Detective Engle was based on out-of-court witness statements and, thus, hearsay, and that it was the province of the jury to determine the time line of the case based on the testimony of witnesses at trial. The trial court did not abuse its discretion in sustaining the State's objection to further questions by Wilson regarding the detective's time line.

{¶ 83} Third, Wilson claims that the testimony from Dawson and her nephew, Windale, as to statements made by McGee during her argument with Wilson should have been excluded as hearsay.

{¶ 84} As stated above, Windale testified that he awoke during the night and heard McGee screaming, "I wasn't with nobody" and "I didn't do nothing." After that, Windale

heard "a loud glass breaking," and he soon went back to sleep  The trial court permitted Windale to testify to McGee's statements, over defense counsel's objections, as excited utterances.

{¶ 85}    Dawson testified that she initially heard Wilson ask McGee, in a conversational voice, where she had been.   The trial court did not allow Dawson to say McGee's response to Wilson.   Dawson then testified that Wilson and McGee began to argue in loud, raised voices, and Wilson continued to ask McGee where she had been.   Dawson testified, without objection, that McGee responded that she was out with her friend.   After hearing a commotion, Wilson accused McGee of lying and Dawson heard the sound of hitting.   Dawson testified, over objection, that she heard McGee say Wilson's name or nickname (Shorty) and "I didn't do nothing."   At the time, Dawson also heard the sound of "hitting" and of McGee crying and whimpering.

{¶ 86}    "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."   Evid.R. 801(C).   In general, hearsay is not admissible.   Evid.R. 802.

{¶ 87}  Evid.R. 803 excludes several types of statements from the hearsay rule, including excited utterances, which are "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."   Evid.R. 803(2).   "The rationale for admitting hearsay statements pursuant to the excited utterance exception is that the declarant is unable, due to the startling event, to reflect on the statement sufficiently to fabricate it."   *State v. Florence*, 2d Dist. Montgomery No. 20439, 2005-Ohio-4508, ¶ 32.

{¶ 88} The State argues that any statements that were overheard before the beating began were not hearsay, because they were not offered for the truth of the matter asserted. It further asserts that, once the beating started, McGee was under the stress of the assault and her statements fell under the excited utterance exception, even if they were hearsay. We agree.

{¶ 89} McGee's initial statements that she had been out with her friends were not offered for the truth of those statements, that is, that she was actually out with her friends. Rather, they were offered to show that Wilson and McGee argued after she returned home from Northtown Bar. Accordingly, McGee's initial statements to Wilson were not hearsay.

{¶ 90} It is not clear whether Windale overheard statements during the beating or prior to the beating; he testified prior to Dawson, and his testimony could not establish whether McGee was being hit when he overheard her say, "I didn't do nothing" and "I wasn't with nobody." (Dawson's subsequent testimony suggests that McGee was, in fact, being hit by Wilson when these statements were made.) Assuming that these statements were made before McGee was physically assaulted, they again were not offered to prove the truth of those statements but rather that the statements, true or false, were made; they demonstrated that Wilson was angry and jealous and that the two were arguing about her activities that night.

{¶ 91} Even if the statements overheard by Dawson and Windale were hearsay, Dawson's testimony made clear that McGee repeatedly denied that she had been with another man while Wilson was physically assaulting her; McGee referred to Wilson by name or nickname while making these denials. Dawson heard sounds of hitting, crying, and

whimpering while McGee made these statements. The record supports the trial court's conclusion that McGee's statements were made while under the stress of a physical assault. The trial court did not err in allowing these statements as excited utterances. (We further note that McGee's references to Wilson by name were cumulative of Dawson's testimony that she recognized both Wilson's and McGee's voices during the argument.)

{¶ 92} Wilson's fourth assignment of error is overruled.

## VI. Biased Jury Pool

{¶ 93} In his sixth assignment of error, Wilson claims that the jury pool was biased. He argues that six of the twelve empaneled jurors were, "without question, exceptionally biased against [him]," because they had connections with law enforcement or were either crime victims themselves or had family members who had been victims of crimes.

{¶ 94} "The Sixth Amendment to the United States Constitution guarantees a defendant the right to a trial by fair and impartial jurors. *Irvin v. Dowd* (1961), 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751. In order to protect this fundamental right, the court conducts voir dire with the purpose of empaneling a fair and impartial jury, free from prejudice or bias. *State v. Twyford* (2002), 94 Ohio St.3d 340, 346, 763 N.E.2d 122; *State v. Crago* (1994), 93 Ohio App.3d 621, 641, 639 N.E.2d 801." *State v. Oliver*, 11th Dist. Portage No. 2010-P-17, 2012-Ohio-122, ¶ 37.

{¶ 95} After the prospective jurors were questioned during voir dire, two prospective jurors were dismissed by the agreement of the parties; two others were dismissed for cause, one at the request of the State and one at Wilson's request, both without objection.

Wilson moved to dismiss three other individuals for cause; the State objected and the court denied the motions. Of those three, Wilson exercised a peremptory challenge to dismiss one of those individuals; the other two were seated as Jurors #2 and #7. Wilson exercised two peremptory challenges on other prospective jurors; he passed on his final peremptory challenge. The State and Wilson each exercised a peremptory challenge as to an alternate juror.

{¶ 96} "[W]here the defense exhausts its peremptory challenges before the full jury is seated, the erroneous denial of a challenge for cause in a criminal case may be prejudicial." *State v. Cornwell*, 86 Ohio St.3d 560, 564, 715 N.E.2d 1144 (1999). "However, '[a] defendant in a criminal case cannot complain of prejudicial error in the overruling of a challenge for cause if such ruling does *not* force him to exhaust his peremptory challenges.'" (Emphasis sic.) *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 87, quoting *State v. Eaton*, 19 Ohio St.2d 145, 48 O.O.2d 188, 249 N.E.2d 897 (1969), paragraph one of the syllabus. Thus, a defendant is prejudiced by the trial court's failure to grant a challenge for cause only if the defendant exercises a peremptory challenge to remove that prospective juror and the defendant exhausts his peremptory challenges before the jury is seated. *Id.*; *see also State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 61 (defendant's failure to use all of his peremptory challenges waived claim that the jury was tainted by pre-trial publicity); *State v. Carter*, 21 Ohio St.2d 212, 214, 256 N.E.2d 714 (1970) (by failing to exercise all peremptory challenges, defendant "acquiesced in the jury that was finally selected"), vacated, in part, on other grounds, 408 U.S. 936, 92 S.Ct. 2859, 33 L.Ed.2d 752 (1972).

{¶ 97} Wilson did not exercise peremptory challenges to remove Jurors # 2 and #7, whom he believed to be biased, and he waived his final peremptory challenge. Accordingly, he cannot claim that the selected jurors were biased.

{¶ 98} Regardless, there is no evidence in the record that any of the jurors about whom Wilson complains was biased against him. "A prospective juror is not automatically disqualified by the fact that a close relative has been the victim of a crime similar to the crime on trial." (Citations omitted.) *State v. Murphy*, 91 Ohio St.3d 516, 525, 747 N.E.2d 765 (2001). Similarly, a prospective juror need not be disqualified merely because the prospective juror is a former police officer or a close friend or relative of a police officer. *See State v. Wolfe*, 4th Dist. Gallia No. 95CA04, 1996 WL 344092 (June 17, 1996). Rather, the trial judge must determine, on a case-by-case basis, whether the juror can be fair and impartial. *See Murphy*, supra.

{¶ 99} Four of the seated jurors stated during voir dire that they or a family member had been a victim of a crime. Juror #2 stated during voir dire that her husband's nephew was shot and killed in Dayton five or six years ago. The perpetrator had been caught and convicted; Juror #2 did not attend the trial. Juror #2 stated that she understood the instant case was a homicide case. When asked if she could be fair and impartial, she indicated that her husband's nephew was involved with drugs and she had no concerns about her ability to be fair and impartial.

{¶ 100} Juror #11 stated that a cousin was a victim of vehicular homicide; the perpetrator was prosecuted and convicted. Juror #11 also indicated that, about eight or nine years before, a man had broken into a female cousin's home in Riverside and had tried

to rape her. Her cousin's assailant was tried and convicted. When asked if she had any feelings about how the case was charged or prosecuted that would cause her concern about being a juror in this case, Juror #11 responded, "No." She stated that she could put her feelings aside for this case.

{¶ 101}    Juror #7 stated that she was the victim of a sexual assault when she was a child; the perpetrator was prosecuted and convicted. Juror #7 told the prosecutor that she did not have any concerns about that process and that she could put that event aside for this case. Defense counsel later asked her, "Based on your experiences as well and your involvement with the criminal justice system, you believe you can be fair and impartial on this particular jury?" Juror #7 responded, "Yes."

{¶ 102}    Juror #4 stated that his car had been stolen and the police later recovered "a shell" of the car; no one was prosecuted for the offense. He also indicated that his car had been vandalized a couple of times – broken mirrors and a "busted" steering wheel. Again, no one was charged. The prosecutor then asked:

[PROSECUTOR]: Okay. And do you have any feelings about that, that you know, you've been a victim twice and nobody's been charged?

[JUROR #4]: Yeah. It feels bad. But I mean, you know, they didn't catch them and –

[PROSECUTOR]: And following up on your bad feeling. Do you – would you be able to keep that separate from what you do here if you're selected as a juror?

[JUROR #4]: Absolutely.

{¶ 103}     Four prospective jurors also indicated that they had connections to law enforcement officers.   Juror #4 stated that Judge Michael Hall, a former police officer, was his brother-in-law.   Juror #4 denied that there was anything about his relationship with Judge Hall that gave him any concerns about being a juror.   He stated that he "absolutely" could be fair and impartial.

{¶ 104}     Juror #3 indicated that she lived next door to an ex-policeman.   The prosecutor told her that she would have to "put that aside and take the facts as you see them without any – putting anything in about, you know this person."   Juror #3 responded that she could do that.

{¶ 105}     Juror #8 stated that she had a cousin who was a park ranger in Colorado.   Juror #8 also did not have any concerns about being juror as a result of that relationship.

{¶ 106}     Finally, Alternate Juror #2 stated that her husband was a Dayton firefighter, that her brother-in-law was a Dayton police officer, and her husband had two cousins who worked for the Montgomery County Sheriff's Office, one of whom was Sheriff Phil Plummer.   She further indicated that she did not see her husband's cousins and saw her brother-in-law "not that often" but at "family things."   Alternate Juror #2 stated that she could be fair and impartial.

{¶ 107}     Based on the jurors' responses to counsels' inquiries, we find no evidence that any of the jurors were biased against Wilson.   Jurors #2, #4, #7, and #11 each indicated that they could put their feelings aside and be fair and impartial.   There is no indication that they were biased due to their or a family member's experience as a victim of

a crime. Moreover, there is no indication that Jurors #3, #4, and #8 and Alternate Juror #2 were biased based on their knowing law enforcement officers. Again, each indicated that he or she could be impartial. Additionally, with respect to Alternate Juror #2, the alternate jurors were excused prior to deliberations, and Alternate Juror #2 had no role in Wilson's conviction.

{¶ 108}        Wilson's sixth assignment of error is overruled.

### VII.   Prosecutorial Misconduct

{¶ 109}        In his seventh assignment of error, Wilson claims that the prosecutor engaged in misconduct by improperly shifting the burden of proof on Wilson's alibi defense.

{¶ 110}        In reviewing claims of prosecutorial misconduct, the test is whether the prosecutor's remarks were improper and, if so, whether those comments prejudicially affected the substantial rights of the defendant. *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *Id.*, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct.940, 71 L.Ed.2d 78 (1982). Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. See *State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

{¶ 111}    During closing argument, the prosecutor argued to the jury that Wilson's alibi covered the wrong period of time, that Wilson's statements to Detective Engle differed from Brown's testimony on his behalf, and that Wilson's version of events was unbelievable. The prosecutor began his discussion of Wilson's alibi defense with the following statements:

> Now the defendant has come forward with this alibi defense. And that's his burden to prove to you that he was somewhere else when they do an alibi defense. He has to prove to you that he was somewhere else for an alibi defense. And there are several problems with the defendant's alibi defense. I want to talk about those.

After discussing Wilson's alibi, the State reviewed the elements of each offense and argued that "the State has proven each and every one of those elements to you with clear, convincing and consistent evidence, which proves beyond a reasonable doubt that this defendant committed the crime of murder, felonious assault, and tampering with evidence when he beat and killed his girlfriend Leanet McGee."

{¶ 112}    Defense counsel responded to the prosecutor's argument. Counsel began,

> [T]he State will get up after I complete my closing argument and they will attack any of the theories that I've put out for you. That's how our system works. They have the burden of proof. And you're going to hear it. The judge has already talked about it in voir dire. Still at this point presumption of innocence is there. Remember that question, they have to

prove stuff.

We did put an alibi defense out there, so I do have the burden of demonstrating what our alibi is or where we were, sure, but the proof – the burden of proof of guilt beyond a reasonable doubt lies on the State to each and one – every one of those elements, that's still on the State. It does not get shifted.

{¶ 113}     The trial court subsequently instructed the jury on burden of proof and alibi. It stated, in part:

The defendant is presumed innocent until his guilt is established beyond a reasonable doubt. The defendant must be acquitted unless the state produces evidence which convinces you beyond a reasonable doubt of every essential element of the offense or offenses charged in the Indictment.

* * *

The defendant claims that he was at some other place at the time the offense occurred. This is known as an alibi. The word "alibi" means elsewhere or a different place. If the evidence fails to establish that the defendant was elsewhere, such failure does not create an inference that the defendant was present at the time when and at the place where an offense may have been committed. If, after a consideration of the evidence of alibi along with all the evidence, you are not convinced beyond a reasonable doubt that the defendant was present at the time in question, you must return a verdict of not guilty.

If you find that the State proved beyond a reasonable doubt all the essential elements of any one or all of the offenses charged in the separate counts in the Indictment, your verdict must be guilty as to such offense or offenses according to your findings.

If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of one or all of the offenses charged in the separate counts in the Indictment, then your verdict must be not guilty according to your findings.

{¶ 114} Wilson did not object to the prosecutor's closing argument. As a result, he has waived all but plain error. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 175; *State v. Ballew*, 76 Ohio St.3d 244, 254, 667 N.E.2d 369 (1996). The plain error rule is to be invoked only under exceptional circumstances in order to avoid a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 95, 372 N.E.2d 804 (1978). Plain error does not occur unless, but for the error, the outcome of the trial clearly would have been different. *Id.* at 97; Crim.R. 52(B).

{¶ 115} "Alibi is not an affirmative defense. Even with an alibi defense, the burden of proof remains with the state." (Citation omitted.) *State v. Goetz*, 1st Dist. Hamilton No. C-970503, 1998 WL 735358, *2 (Oct. 23, 1998). By telling the jury that Wilson had a "burden to prove to you that he was somewhere else" as part of his alibi defense, the prosecutor improperly implied that burden had shifted to Wilson to establish that he was not at the residence when McGee was beaten and killed.

{¶ 116} Nevertheless, the State later acknowledged that it had to prove each

element of the charged offenses beyond a reasonable doubt, and it argued that it had met that burden. During defense counsel's closing argument, counsel directly challenged any implication by the prosecutor that the burden of proving Wilson's guilt had shifted, and he emphasized that Wilson was still presumed innocent and that the State had the burden to establish guilt beyond a reasonable doubt. The trial court properly instructed the jury that the State bore the burden to prove its case beyond a reasonable doubt and that the jury could not infer that Wilson was at his home when McGee was beaten and killed based solely on a decision not to believe Wilson's alibi defense. Given defense counsel's direct refutation of the prosecutor's implication that Wilson bore the burden to prove his alibi defense, the trial court's proper instructions on the burden of proof and alibi, and the substantial evidence supporting Wilson's conviction, we cannot conclude that the prosecutor's closing argument affected the outcome of Wilson's trial.

{¶ 117} Wilson's seventh assignment of error is overruled.

## VIII. Cumulative Error

{¶ 118} In his eighth assignment of error, Wilson claims that all of the alleged errors at trial cumulatively resulted in prejudicial error, warranting a reversal of his conviction and a new trial.

{¶ 119} The Supreme Court of Ohio has stated that numerous harmless errors may cumulatively deprive a defendant of a fair trial and thus *may* warrant the reversal of his conviction. (Emphasis added.) *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). The doctrine of cumulative error does not apply in this case because Wilson has not identified multiple instances of harmless error. *Id.* Although Wilson's trial was

not without error, he is not entitled to a reversal of his conviction on the basis of cumulative prejudicial error.

{¶ 120}     The eighth assignment of error is overruled.

### IX.   Conclusion

{¶ 121}     The trial court's judgment will be affirmed.

. . . . . . . . . .

FAIN, J. and WILLAMOWSKI, J., concur.

(Hon. John R. Willamowski, Third District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

R. Lynn Nothstine
Daniel R. Allnutt
Hon. Timothy N. O'Connell